[Civ. No. 1777.    Third Appellate District.—March 11, 1918.]

## MARY ILARDI, an Infant, by ALEXANDER FIORE, Guardian Ad Litem, Respondent, v. CENTRAL CALIFORNIA TRACTION COMPANY (a Corporation), Appellant.

NEGLIGENCE—DRIVER OF VEHICLE—INJURY TO PASSENGER—IMPUTED NEGLIGENCE.—A person riding as a passenger or guest in a vehicle driven by another may not be charged with the negligence of the latter which has caused injury to the former, unless the passenger or guest has the right to exercise control over the driver of the vehicle, or, in the eyes of the law, may be said to possess such power or control, or unless it is made to appear that the passenger or guest himself actively participated in the negligence of the driver.

ID.—DUTY OF PASSENGER.—While a guest or a passenger riding in a vehicle with another is not chargeable with the latter's negligence which has directly resulted in injury to the passenger or guest, the law nevertheless casts upon such passenger or guest in such case the duty of exercising ordinary care for his own safety.

ID.—ACTION FOR DEATH—COLLISION AT RAILROAD CROSSING—CONTRIBUTORY NEGLIGENCE—EVIDENCE—BURDEN OF PROOF.—In an action for damages for death of a person riding as a guest in a horse-drawn vehicle which collided with an interurban electric railroad train at a crossing, the burden is upon defendant railroad company to show that deceased failed to exercise such care for his own safety as was required of him to charge the defendant with legal responsibility for his death.

ID.—OMISSIONS OF PASSENGER—INSUFFICIENT PROOF OF CONTRIBUTORY NEGLIGENCE.—In such action, the failure of the deceased to say or do anything or to look in both directions before the horse was started by its driver over the crossing did not constitute negligence *per se*, or such acts of omission as to justify the conclusion or declaration, as a matter of law, that deceased failed to use due care for his own safety.

ID.—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.—In such action, the question whether deceased was guilty of negligence which directly caused his death was one exclusively for the jury's determination.

ID.—LAST CLEAR CHANCE DOCTRINE—PROPER INSTRUCTION.—An instruction that one having knowledge of the dangerous situation of another and having a clear opportunity, by the exercise of proper care, to avoid injuring another, must do so, notwithstanding that the latter has placed himself in such situation of danger by his own

negligence, and that if the jury found that the motorman saw the deceased on the wagon on the track, and could have stopped the train without injury to the same or its passengers, and by so stopping the train within the shortest time and space possible under the circumstances could have avoided the collision, and neglected to do so, in consequence of which neglect to stop the train the deceased was killed, the plaintiff is entitled to a verdict, is a correct statement of the last clear chance rule.

ID.—CROSSING OF RAILROAD TRACK—WHEN NEGLIGENCE.—The mere act of passing over a railroad crossing over a public street is not negligence *per se,* but only when the attempt is made to pass without using reasonable care in ascertaining in the proper way whether there is a train approaching or about to approach.

APPEAL from a judgment of the Superior Court of Sacramento County. Charles O. Busick, Judge.

The facts are stated in the opinion of the court.

Butler & Swisler, for Appellant.

Downey, Pullen & Downey, and Ralph Smith, for Respondent.

HART, J.—The action was brought to recover from the defendant, Central California Traction Company, damages for its negligence in causing the death of Gandolfo Ilardi, the father of plaintiff, who, at the time of the commencement of the action, was about eleven years of age. The defendant, Rosa Ilardi, is the widow of the deceased and the stepmother of plaintiff. She was joined as a defendant, for the reason, as stated in the complaint, that she had refused to join as a party plaintiff. She made no appearance in the action and her default was duly entered, but she is not affected by the judgment, which was against the defendant, Central California Traction Company, for the sum of three thousand five hundred dollars. The appeal is by said company from the judgment.

Appellant owns and operates an interurban electric railroad between the cities of Sacramento and Stockton, carrying passengers and freight between said cities and way stations. Running southerly from Sacramento, for a distance of more than half a mile, trains are operated over a single-track road on the east side of, and parallel with, a public highway known

as the Upper Stockton Road, which road is paved along its center with asphaltum, the paved portion being about eighteen feet in width, while on each side of the pavement the road has a dirt surface about ten feet in width. The railroad track is immediately along the east side of the dirt road east of the pavement. At a point outside the city limits of Sacramento, a street, known as Vina Vista Street, crosses said railroad track at a right angle and intersects with, but does not cross, said Upper Stockton Road. The view from Vina Vista Street for a distance of half a mile north or toward the city of Sacramento was unobstructed.

The evidence discloses that one Sansone and the deceased, who were brothers-in-law, resided on Vina Vista Avenue; that the deceased, who, at the time of his death, was thirty-four years of age, had been employed in the shops of the Southern Pacific Company, in the city of Sacramento; that some two months previously to the accident whereby he lost his life, he had met with an accident at the railroad-shops, a piece of steel having been imbedded in his left eye; that for some time before he was killed, he made daily trips to an oculist in the city of Sacramento for treatment, leaving his home in the early morning for that purpose and generally returning in the afternoon with said Sansone in the latter's wagon, which was what is known as a "contractor's wagon."

The accident in which the deceased lost his life occurred on the seventeenth day of January, 1914, at about 4:30 o'clock P. M. Sansone had left his home in said wagon, drawn by a single horse, early in the morning and went to Sacramento City. The deceased had also gone to the city for treatment by the oculist. At about 1 o'clock on the afternoon of that day the deceased joined Sansone at Sixth and D Streets, in said city, and the two started together in the wagon for their homes on Vina Vista Avenue, the wagon being loaded with lumber. Sansone was the owner of the horse and wagon and Ilardi was riding with him merely as his guest, he having no interest in or control of or over the horse and wagon or the business for which Sansone used them. Sansone, who was driving, sat on the right hand and the deceased on the left-hand side of the seat. They were traveling south and on the west side of the Upper Stockton Road until reaching a point within a distance of about two city blocks from Vina Vista Street, when a horse and wagon driven by one Fletcher,

and proceeding from a driveway on the west side of the road or street, caused Sansone to pull over to the dirt road on the east side and some eight or ten feet from the appellant's railroad track. After passing said horse and wagon, Sansone, so he testified, turned back to the west side of the road. Upon reaching Vina Vista Street, however, Sansone turned to the left and started to cross the railroad track, and at this instant of time an interurban train of two cars, traveling south from Sacramento, struck the wagon, throwing it, the horse, and the occupants of the wagon a considerable distance from the crossing. As a result of the collision Ilardi was almost instantly killed.

The evidence further shows that the day upon which the accident occurred was cloudy, that it had been raining during most of the day, and that a heavy southeast wind was prevailing at the time of the accident. Sansone testified that when he reached a point about twenty-five feet from the Vina Vista crossing, he stopped the horse and looked to the north and the south; that he saw or heard no train coming from either direction, and then proceeded on toward the crossing; that, when at a distance of five feet from the crossing, he again halted the horse and again looked in both directions to see if there was a train approaching and also listened for the noise or some signal of one, but that he neither saw nor heard one, and so started across the track, with the result as above described.

A number of witnesses testified that the train, just before it struck the wagon, was traveling at from thirty to forty miles an hour, and certain witnesses testified that they heard no whistle or other signal proceed from the train, while there were others who said that, a few seconds before the collision, they heard a loud, long whistle, followed in close succession by two short, shrill whistles. And, while some of the witnesses testified that they could see up and down the track at the time of the accident a distance of five or six blocks, Sansone testified that, on account of the darkness of the day, due to the cloudy skies and the lateness of the hour, he could see no greater distance, either up or down the track, than 250 feet. He further testified that the deceased did not at any time, before they turned and started to cross the track, say anything or look either up or down the track. He was merely "sitting there," said the witness. The testimony fur-

ther showed that .Ilardi, before he received the injury to his eye, had for a long time almost daily gone to his place of employment and returned to his home on Vina Vista Street on the cars of the appellant, and was, of course, familiar with the existence of the railroad track at said street.

The motorman testified that the train, at the time of the accident, was traveling at the rate of from fifteen to eighteen miles an hour. He further testified that he possibly could have stopped the train within a distance of 150 feet. He admitted that the last crossing signal he sounded before the collision was at a point between Hartley and Vine Streets, and just after leaving the former street, which is north of Vine, and that he did not blow the whistle for the Vina Vista Street crossing until he saw the horse and wagon in the act of crossing the track at said street. The motorman, according to his testimony, first observed the wagon in which Sansone and the deceased were riding before he reached Vine Street. He said that he noticed the vehicle particularly because it was traveling on the wrong side of the road; that he kept his eyes on the wagon, thinking possibly that it might be turned to pass over one of the street crossings; that when he was near Vine Street, the wagon was very near Vina Vista Street. The horse was traveling at a very slow rate of speed—not over two or three miles an hour, according to his best judgment. It should be stated that Vina Vista Street is the next street to Vine Street, being south of the latter street.

C. M. Elliott, a civil engineer, testified that he measured the distance from the center of Vine to the center of Vina Vista Street and found it to be 345 feet.

The witness, Currier, whose home was on Vine Street on the west side of the Upper Stockton Road, testifying for the defendant, stated that he was on his way home on foot from Sacramento and about three blocks from Vina Vista Street when the collision occurred; that he heard a loud, shrill whistle from the street-car when it was about fifty feet from Vine Street, but whether about fifty feet above or below he said that he was unable to remember; that almost simultaneously with the hearing of the whistle he looked down the road and saw the horse driven by Sansone in the act of going upon and across the railroad track at Vina Vista Street. He said that it was his best judgment that at the time the train blew

its whistle the nose of the horse drawing Sansone's wagon was as far as the track.

The foregoing embraces a statement of the facts and the testimony necessary to have in view and to be considered in passing upon the points urged upon this appeal for a reversal..

The grounds urged for the reversal of the judgment, generally stating them, are: 1. That the deceased failed to exercise due care to avoid the accident and was guilty of contributory negligence which proximately caused his death; 2. Error in giving, modifying, and refusing to give certain instructions.

1. We may pretermit any expression of opinion upon the question whether the evidence shows that Sansone, owner and, at the time of the accident, driver of the horse and wagon, was guilty of negligence proximately causing the accident and the consequent injury to and death of Ilardi; for, as we understand counsel for the appellant, they do not claim that the negligence of Sansone is imputable to Ilardi. The cases are quite uniform in the enunciation of the rule that a person riding as a passenger or guest in a vehicle driven by another may not be charged with the negligence of the latter which has caused injury to the former, unless the passenger or guest has the right to exercise control over the driver of the vehicle, or "in the eyes of the law may be said to possess such power of control" (*Bryant* v. *Pacific Elec. Ry. Co.,* 174 Cal. 739, [164 Pac. 385]), or unless it is made to appear that the passenger or guest himself actively participated in the negligence of the driver. (See, in addition to case above cited, the following: *Wilson* v. *Puget Sound Co.,* 52 Wash. 522, [101 Pac. 50, 132 Am. St. Rep. 1044]; *Howe* v. *Minneapolis etc. Ry. Co.,* 62 Minn. 71, [54 Am. St. Rep. 616, 30 L. R. A. 684, 64 N. W. 102]; *Clarke* v. *Connecticut Co.,* 83 Conn. 219, [76 Atl. 523]; *United Rys. & Elec. Co. etc.* v. *Crain et al.,* 123 Md. 332, [91 Atl. 405]; *Hermann* v. *Rhode Island Co.,* 36 R. I. 447, [90 Atl. 813]; *Chadbourne* v. *Springfield St. Ry. Co.,* 199 Mass. 574, [85 N. E. 737]; *Perez* v. *New Orleans City & L. R. Co.,* 47 La. 1391, [17 South. 869]; *Lininger* v. *San Francisco R. R. Co.,* 18 Cal. App. 411, [123 Pac. 235]; *Bresee* v. *Los Angeles Traction Co.,* 149 Cal. 131, [5 L. R. A. (N. S.) 1059, 85 Pac. 152]; *Fujise* v. *Los Angeles R. Co.,* 12 Cal. App. 207, [107 Pac. 317] *Parmenter*

v. *McDougall*, 172 Cal. 306, [156 Pac. 460].)  But it is argued that, because the deceased, before Sansone started to drive across the track, knowing that trains, at frequent intervals during the day, passed over the track, failed to look up and down the track to ascertain whether or not a train was approaching, but remained passive or quietly in his seat on the wagon, saying nothing and doing nothing, this court is justified in declaring that, as a matter of law, he did not exercise ordinary care for his own safety, or, in other words, that he was guilty of negligence proximately contributing to his fatal injuries.

It is obviously true, as the above-cited cases plainly point out, that, while a guest or a passenger riding in a vehicle with another is not chargeable with the latter's negligence which has directly resulted in injury to the passenger or guest, the law nevertheless casts upon such passenger or guest in such case the duty of exercising ordinary care for his own safety, and the court in this case in clear language so instructed the jury.  But unless the evidence shows beyond question that the passenger or guest failed to exercise such care as was necessary for his own safety, then the question whether he was remiss in that respect or was guilty of negligence contributing to his injury is primarily for the jury.  The burden was cast upon the defendant to show that the deceased failed to exercise such care for his own safety as was required of him to charge the defendant with legal responsibility for his death.  The question here, then, is whether there was any justification for the implied finding of the jury that the deceased was not culpable in that respect. There is no evidence of any overt or affirmative act of negligence on the part of Ilardi or that he participated in the negligence of Sansone, assuming the latter to have been guilty of negligence, by urging him, with knowledge of the near approach of a train, or with knowledge that he (Sansone) had not looked and listened to ascertain whether there was a train near at hand, to proceed on over the crossing. Nor is there any evidence that Sansone was an incompetent or careless driver, or that Ilardi had any reason to suppose that he was not competent to drive the horse properly or to believe that Sansone was not doing his duty by looking for approaching trains.  It is true, if we accept Sansone's testimony as to that matter, that Ilardi said nothing and did

nothing and looked neither to the north nor south before the horse was started by Sansone over the crossing; but this did not constitute negligence *per se*, or such acts of omission as to justify the conclusion or declaration, as a matter of law, that he failed to use due care for his own safety, since he was a mere guest of Sansone, riding with the latter by his permission and sufferance, and, having no interest in the plans or purposes for which Sansone was then using the horse and vehicle, and was without any right or power to exercise any control over the latter in the management of the vehicle. Moreover, the deceased knew that Sansone, having been accustomed for some time to driving over the Vina Vista crossing, knew as fully or as well as he did that trains passed frequently over the railroad track every day, and, as there is, as stated, no evidence that Sansone was ordinarily a careless driver or did not know how to manage a vehicle drawn by a horse, the deceased had the right to assume that Sansone would exercise reasonable care and caution in making the crossing. Furthermore, in considering whether the deceased exercised the care which is required of a person situated as he was, the jury were entitled to and probably did take into account these facts: That the day was more or less darkened by clouds, that the accident occurred at a late hour of a midwinter day, that a strong wind was blowing from the southeast and in the opposite direction from which the train was traveling, the natural effect of which was to drive the noise which usually proceeds from a moving train from the direction and the hearing of himself and Sansone. Besides, the eyesight of the deceased was greatly impaired, and, if the jury believe Sansone when he said that he looked and saw no train approaching (and it cannot be said that they did not), then it is probable that they concluded that, if the deceased did look to the north, he was no more likely to see the train than was Sansone; and that they had the right to believe, notwithstanding Sansone's *apparent* statement to the contrary, that the deceased did look to see whether there was a train approaching the crossing over which they were about to pass, there can be no doubt, since it was made to appear that the deceased was perfectly familiar with the conditions existing as to the crossing, having passed over it innumerable times and having almost as frequently ridden on the defendant's cars from

that point, and since, furthermore, the presumption is (a disputable presumption, it is true) that the deceased exercised due care for his own safety, having in view the surrounding conditions with which he was familiar. (*Baltimore & Potomac R. R. Co.* v. *Landrigan,* 191 U. S. 461, [48 L. Ed. 362, 24 Sup. Ct. Rep. 137]; *Drouillard* v. *Southern Pac. Co., ante,* p. 447, [172 Pac. 405].) What more the deceased could have done than what he did do under all the circumstances it is not easy to suggest. He had no right to interfere with Sansone's management of the horse and vehicle, and, as the cases say, in most instances such interference by the passenger or guest where the vehicle is about to be placed in a position of danger might prove to be gross imprudence and so disconcert the driver as to cause the disastrous result which such interference was designed to avoid. (See *Howe* v. *Minneapolis etc. Ry. Co.,* 62 Minn. 71, [54 Am. St. Rep. 616, 620, 30 L. R. A. 684, 64 N. W. 102], and the other cases above named.) The jury were justified in concluding that all he could do under the circumstances was to remain quiet, as he did, and to rely upon the driver, who had exclusive control and management of the horse and vehicle.

In *Hermann* v. *Rhode Island Co.,* 36 R. I. 447, [90 Atl. 813], the plaintiff was injured as the result of a collision between the automobile in which she was riding as the guest of the owner and driver of the machine with a railroad train of the defendant. The court in that case said: "In accordance with both reason and weight of authority, any negligence on the part of Berghmann [driver of the auto] which may have contributed to bring about the collision cannot be imputed to either of these plaintiffs [husband and wife having joined in the suit], between whom and Berghmann no relation of master and servant, principal and agent, or participators in a common enterprise, existed in fact, or should be implied in law. It is the duty of such guest or passenger, in circumstances similar to those under consideration, to use reasonable care for his own safety. Whether he has exercised such a degree of care is primarily for the jury. It cannot be said, as a matter of law, that such guest or passenger is guilty of negligence because he has done nothing. In many such cases, the highest degree of caution may consist of inaction. In situations of great and sudden

peril meddlesome interference with those having control, either by physical act or by disturbing suggestions and needless warnings, may be exceedingly disastrous in its result. While it is true that it is the duty of such guest or passenger not to submit himself and his safety solely to the prudence of the driver of the vehicle, and that he must himself use reasonable care for his own safety, nevertheless, he should not in any case be held guilty of contributory negligence merely because he has done nothing.'' The court then proceeds to state certain conditions the existence of which would justly lead to the conclusion that the guest or passenger had not used the requisite care for his own safety and so not be entitled to recover for his injury. None of the supposititious conditions so suggested, however, was shown to exist in this case.

The other cases above cited, notably *Wilson* v. *Puget Sound Elec. Ry. Co.,* 52 Wash. 522, [132 Am. St. Rep. 1044, 101 Pac. 50], express views similar to those above reproduced herein from the Hermann case.

Our conclusion is that the question whether the deceased was guilty of negligence which directly caused his death was, under the circumstances of the case as presented, one exclusively for the jury's determination.

2. The complaint against the court's charge is aimed at those portions thereof whereby the question was submitted to the jury whether the defendant, by the exercise of reasonable diligence, could have prevented the accident and the failure to do so constituted the proximate cause of the accident and its consequences, notwithstanding that the deceased himself might have been guilty of antecedent negligence contributing to the collision. This proposition involves the doctrine known as the "last clear chance" or opportunity, and there was evidence justifying the court in submitting that question to the jury. In substantiation of this statement, we have only to refer to the conduct of the deceased as above described, to the testimony of Sansone that, although just before starting over the crossing he looked up and down the track and saw no train coming from either direction, and particularly to the testimony of Elliott, the civil engineer, who measured and gave the distance between Vine and Vina Vista Streets, to that of the witness, Currier, who testified that, almost at the very time he heard the whistle of the

36 Cal. App.—32

car near Vine Street, he saw Sansone in the act of driving over the crossing at Vina Vista Street, the horse's nose then being as far as the track, and to that of the motorman who testified that he could possibly have stopped the train at the rate at which it was then going within a distance of 150 feet, and further testified that he saw Sansone and the deceased for several blocks before they reached Vina Vista Street and kept close watch of their movements all the way down.

Elliott, it will be recalled, said that the distance from the center of Vine to the center of Vina Vista Street was 345 feet. Currier, although not certain whether, when he heard the whistle, the train was fifty feet north or fifty feet south of Vine Street, was reasonably certain that it was not more than fifty feet from said street on either side. Manifestly, if, when the train whistled, it was fifty feet north of Vine Street, there was then an intervening distance between the train and Vina Vista crossing of over four hundred feet. If, however, the train was fifty feet south of Vine when it blew its whistle, there was still approximately three hundred feet between the train at that point and the Vina Vista crossing, and, according to the motorman himself, he could have stopped the train after Sansone had driven partly on the track so as to have avoided the collision. Thus the question whether the defendant could have prevented the accident by the exercise of a proper degree of care and diligence was introduced into the case, and it was obviously proper for the court to instruct the jury upon that issue.

Typical of the several instructions given by the court and addressed to that question is the following: "One having knowledge of the dangerous situation of another and having a clear opportunity, by the exercise of proper care, to avoid injuring another, must do so, notwithstanding that the latter has placed himself in such situation of danger by his own negligence. If, therefore, you should find from the evidence that the motorman of defendant's car which collided with the wagon saw the decedent on the wagon on the track, and could have stopped the train without injury to the same or to its passengers, and by so stopping the train within the shortest time and space possible under the circumstances could have avoided the collision, and neglected to do so,

in consequence of which neglect to stop the train, the decedent was killed, the plaintiff is entitled to a verdict.''

There can be no doubt that the above instruction involves a correct general statement of the rule.

Of course, in a case where the evidence plainly and clearly showed that the injured party himself had an opportunity (of which he then had knowledge) to relieve himself of the perilous position into which he had negligently placed himself, and could have done so by the exercise of reasonable diligence and thus himself have avoided the accident, then such a situation would be presented as is to be found in several of the cases cited by the defendant. In such a case, it would be no less the duty of the party so placing himself in such a position to prevent the accident than it would be for the other party to do so, and if under such circumstances an accident occurred and damage to person or property resulted, the negligence of the party placing himself in the position of danger would be a continuing, active, concurring cause thereof. But no such a case is presented here. While a railroad crossing over a public street is itself a signal of danger, and those attempting to make the crossing must always exercise due care and caution, still the public obviously have the right to pass over it. The mere act of passing over the crossing is not negligence *per se*. There is negligence only when the attempt is made to pass over the crossing without first using reasonable care in ascertaining in the proper way whether there is a train on the track approaching the crossing or about to approach it. There is evidence here that Sansone looked both ways before he started over the track and saw no train before and at the time the horse and vehicle were started over the crossing; that the train suddenly and unexpectedly came upon Sansone and the deceased, and that, therefore, their position unexpectedly became one of peril only when it was too late for them to withdraw therefrom in time to have avoided the accident. Thus it is clear that upon that question the case was one peculiarly for the jury, or, in other words, not a case where, as is true of the cases cited by the defendant, it can be said, as a matter of law, that the negligence of the deceased was a continuing, active, efficient, concurring cause of the accident and its consequences.

We have found no legal reason for disturbing the judg-ment, and it is therefore affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 10, 1918.