## ENGHLIN v. PITTSBURG COUNTY RY. CO.

No. 21980.   Sept. 25, 1934.

Arnote & Arnote, for plaintiff in error.

Carl Monk and James H. Gordon, for defendant in error.

RILEY, C. J.   This is an appeal from a verdict and judgment against plaintiff in error in an action to recover damages for personal injuries growing out of a collision between an automobile in which plaintiff was riding and a street car operated by defendant.

Plaintiff in her petition alleges, in sub-

stance, that on the 9th day of April, 1929, at the invitation of one Dr. J. C. Bentley, she accompanied him as a guest on a pleasure drive in his automobile, Dr. Bentley driving the car and plaintiff sitting by his side; that they were driving east on Polk avenue in the city of McAlester; that defendant, through its servants, agents, and employees, carelessly and negligently operated one of its cars going north on First street in said city in such a manner that by the carelessness and negligence of the employees of defendant in operating said street car, it collided with and struck the automobile in which plaintiff was riding as it crossed the street car track at the intersection of said streets; that said street car was being negligently operated in that it was being driven at a high rate of speed of 30 miles an hour; that the operator failed to sound the whistle, gong, bell, or horn, or to give any other signal of the approach of said street car at said crossing; failed to slow down said street car at said crossing so as to have same under control; failed to slow down or stop said street car after discovering plaintiff, and the car in which she was riding, approaching the said crossing; carelessly and negligently operated said street car in a reckless and imprudent manner so as to endanger life and property and at a greater rate of speed per hour than was permitted by the ordinances of the city of McAlester, and in violation of certain specific provisions of the ordinances of the city. Said sections were specifically pleaded, and copies attached to the petition as a part thereof. The petition further alleged that the crossing where the collision occurred was a dangerous crossing in that the view of same was obstructed in approaching the crossing on the street car track from the south by a steep incline on Polk avenue, and by embankments on both sides of the street car track on First street south of Polk avenue, and by the growth of trees, shrubs, and other vegetation on the side of Polk avenue, all of which was well known to defendant and its employees.

Plaintiff's alleged injuries were specifically stated, and she alleged that as a result thereof she was greatly bruised and wounded, suffered great pain and mental anguish, and nervous prostration.

Defendant answered by general denial and further alleged in substance that if plaintiff was injured as alleged, such injuries were due solely to negligence and lack of care on the part of plaintiff herself in that plaintiff and Dr. Bentley were engaged in a joint adventure; further alleged that plaintiff was not exercising ordinary and reasonable care for her own safety; that she approached the street car crossing without looking or listening for approaching street cars; that plaintiff failed to warn or direct the driver to slow down on approaching the crossing or bring said automobile to a full stop before entering the intersection as required by the city ordinance; that she failed, neglected, and refused to warn or direct the driver to sound a signal when approaching said intersection as required by section 34 of the ordinance of the city; that she carelessly and negligently permitted the driver of said automobile to run onto, strike, and collide with the street car; that if plaintiff was injured as alleged in the petition, her injuries were proximately caused by her contributory negligence.

Reply was a general denial.

The cause was tried to a jury, resulting in a verdict and judgment for defendant, and plaintiff appeals.

There are nine assignments of error grouped under four propositions.

It is first contended that the verdict is contrary to the evidence and the law.

Under this proposition plaintiff in effect contends that the preponderance of the evidence is so clearly in her favor as to require a reversal. Defendant likewise contends that the preponderance of the evidence is all in its favor.

The parties argue the case on this question as though this court, like a jury, is to weigh the evidence and determine the controverted issues of fact. It is not for this court to determine from conflicting evidence where the weight thereof lies.

Questions of fact in cases of this kind are for the jury to determine. The record discloses that plaintiff produced evidence which if believed by the jury, or if accepted by the jury as being of the greater weight, would clearly entitle her to a verdict. On the other hand, defendant produced evidence which, if believed by the jury or accepted by the jury as being of greater weight, entitled it to a verdict. Thus the evidence on the material questions of fact is in direct conflict.

In an action at law, where a general verdict has been returned and a judgment rendered upon such verdict, and the evidence is conflicting and there is evidence reasonably

tending to support the verdict, the Supreme Court will not weigh the evidence to determine where the preponderance lies and will not substitute its judgment for that of the jury. To attorneys who are not yet convinced that this rule is firmly established in this state we need only to refer to the Oklahoma Civil Digest, vol. 1, pars. 243-248, inclusive, and the several hundred cases there cited.

The second proposition is that the court erred in admitting evidence over the objection of plaintiff. Under this proposition the admission of testimony by witnesses on three separate questions is urged as error.

First, the question of speed at which the automobile in which plaintiff was riding was being driven as it approached the intersection. The evidence of plaintiff was to the effect that Dr. Bentley was driving his automobile at a moderate rate of speed when approaching the crossing. Just before crossing First street he stopped his automobile about 25 or 35 feet west of the street car track; that he looked in both directions along the street car track, and observed no street car approaching, whereupon he proceeded to cross the intersection, and had attained a speed of about four to six miles per hour when the street car struck the automobile. Defendant produced as a witness Mrs. Ethel Ingold. She testified that she was a passenger on the street car that collided with Dr. Bentley's automobile; that she was seated about the fourth seat on the east side of the street car; that she saw the automobile as it approached the intersection. The record of her testimony from this point is:

"Q. I will ask you to state what speed the automobile was coming, if you know? A. Well, it seems to me it was coming— Mr. Arnote: Object to what it seems to her. Q. Just from what you observed? Mr. Arnote: Object to it because she is not qualified to state. The Court: Objections sustained, exceptions saved by defendant to the ruling of the court. Q. Was the car coming fast or slow, the automobile I mean. A. It seemed to me— Mr. Arnote: Object to what 'It seemed to me', Your Honor. The Court: Overruled, exceptions saved by the plaintiff to the ruling of the court. A. At a rapid rate, it seemed to me it was coming. Mr. Arnote: Ask to strike the answer because it is just what it seemed to her. The Court: Overruled, exceptions saved by the plaintiff to the ruling of the court."

It is contended that this was error, and in support of this contention plaintiff cites three cases from this court and one from Iowa.

Diebold Safe & Lock Co. v. Holt, 4 Okla. 479, 46 P. 512, and Western Union Tel. Co. v. Coyle, 24 Okla. 740, 104 P. 367, are cited. Neither of these cases supports the contention. C., R. I. & P. Ry. Co. v. Barton, 59 Okla. 109, 159 P. 250, is also cited. Therein the witness testified that in his judgment the train in question was going "some place close to 15 miles per hour, maybe more." But there the witness had just stated that he did not observe the rate of speed. It was held that the witness had disqualified himself. It was not, however, that the witness was not qualified to judge the speed of a train, but that he had said he did not observe or note the rate of speed.

Livingston v. Dole (Iowa) 167 N. W. 639, is also cited as supporting the contention. But there, as in the C., R. I. & P. Case, supra, the witness was not qualified by reason of his not having observed the rate of speed of the automobile concerning about which he was called upon to testify. He was not disqualified by reason of inability to approximately estimate the rate of speed.

In A., T. & S. F. Ry. Co. v. Miles, 69 Okla. 138, 170 P. 896, it is held:

"Persons of intelligence and observation may testify as to the speed of a train without qualifying as experts; the lack of expert knowledge concerning speed of trains affects the weight to be given by the jury to such evidence rather than the competency of the witness."

Since automobiles have been in general use for a long time, any person of ordinary intelligence should be able to testify as to the approximate speed of a moving automobile without being required to qualify as an expert. The want of expert knowledge goes more to the weight and credit to be given by the jury to such evidence than the competency of the witnesses.

The admission of the letter written by Dr. Ned R. Smith of Tulsa to Dr. R. H. Pemberton of McAlester, and certain testimony in the deposition of Dr. Smith, is assailed as reversible error.

It appears that Dr. Pemberton was assistant physician for defendant railway company. On April 10th, after the accident, plaintiff called Dr. Pemberton, who examined her. He testified concerning the condition of plaintiff at the time of this examination. He treated her until about the last of August of that year. About the 8th day of May, 1929, plaintiff went to Dr. Smith of Tulsa, specialist in neurology. He gave her a neurological and physical examination. He tes-

tified as to the result of said examination as follows:

"Q. What was the result of your examination? A. I arrived at the diagnosis of traumatic neurosis. Q. Please explain what that means, what traumatic neurosis means. A. A state of abnormal functioning of the nervous system, as a result of a state of doubt, fear, uncertainty as to the patient's physical, nervous, and mental condition, from some incident or occurrence in their life previous. In this case it was directly related to the accident that the patient told me about. Q. In your judgment, what was the cause of her condition? Please state a little more fully. A. An automobile accident which she told me about, that had occurred, according to my records, some one month previously, in which she was riding in a car and the car had been struck by a railway car or interurban I believe, but she was rather severely bruised and banged up, out of which her nervous symptoms had developed later. Q. Did you find any other causes—strike that. In your examination of her at that time, did you find any other causes for her neurosis condition? A. I could not arrive at any other cause for her symptoms and condition than the accident, as a result of my interview with her."

On May 8, 1929, Dr. Smith wrote Dr. Pemberton the following confidential letter:

"Dear Doctor:

"I was consulted yesterday by a Miss Enghlin regarding her nervous condition.

"Her complaint is that she has a feeling of oppression in the chest, she trembles and is weak and has no appetite. These complaints are all very definitely related to a motor car accident one month ago. She was rather severely bruised and shaken up, but states that no bones were broken. The neurological examination is negative for an organic lesion of the nervous system. The diagnosis of her present trouble is that of traumatic anxiety neurosis. I will be inclined to suspect that there are factors in the accident that the patient would be somewhat reluctant to disclose and that these factors are more probably the fundamental cause of her neurosis. I think she would be best treated by a positive reassurance that her trouble is only a 'nervous shock' and that she will shortly be well again; however, should she not respond to this form of simple suggestive therapy, a more detailed investigation as to the mechanism back of her nervousness would be in order. I gave her a prescription for bromide invalerian to reinforce my suggestions."

Dr. Pemberton refused to give the original letter to defendant's attorney, and while the deposition of Dr. Smith was being taken,

counsel for defendant called upon him to produce his office copy of the letter. Both he and counsel for plaintiff strenuously objected, but upon a threat of counsel for defendant to have the deposition quashed unless Dr. Smith produced the copy of said letter, he finally produced it. He was questioned as to the meaning of certain parts of said letter, and testified as follows:

"Q. I now ask you the meaning of this sentence: 'I will be inclined to suspect that there are factors in the accident that the patient would be somewhat reluctant to disclose and that these factors are more probably the fundamental cause of her neurosis.' Q. To what things do you refer? A. I refer to just what the statement says, to probably unknown factors to me at that time that might have entered into this thing. I want to retract the last half of that statement, however. I do not think they are more fundamental than the accident. It was error on my part to have made that statement at that time. Q. Well, in making that statement, to what definite factors did you refer? A. None; nothing definite. Q. Just guess work, speculation, something like that? A. Speculation is the more proper term, not guess work. Q. You are an expert in your speculation; what in your expert speculation was it? A. It might have been anything in the world. Q. I understand, but will you tell us what you think it was? A. I haven't the slightest notion as to what it might have been. Q. There was something, though, that you thought she would be reluctant to disclose, and you felt at that time that she was reluctant to disclose them, didn't you, Doctor? A. That was my impression. There are very few patients in their first interview with a doctor who will uncover their soul, and it might be necessary. It frequently is in this game."

At the trial when the deposition was being read, all of the objections of plaintiff's counsel were overruled by the court. The letter was then offered and received in evidence over the objection of plaintiff.

The doctor's deposition was taken on May 10, 1930. Trial of the case was not commenced until May 22, 1930. At the time the depositions were being taken, plaintiff had not yet submitted herself as a witness and had not testified concerning the matters and things about which Dr. Smith was being examined. The letter being a confidential communication concerning knowledge obtained by a physician by a personal examination of a patient, Dr. Smith was at that time an incompetent witness to testify concerning these matters under the provision of subdivision 6, section 589, C. O. S. 1921, without

the consent of the plaintiff. Plaintiff did thereafter submit herself as a witness concerning the matters and things about which Dr. Smith was being examined. She also testified that she had told Dr. Smith that she had been in an automobile accident; that a street car hit the automobile in which she was riding; that she was thereby injured and had never gotten over it. The part of the letter which is specifically objected to, and concerning which Dr. Smith was called to testify is: "I will be inclined to suspect that there are factors in the accident that a patient would be somewhat reluctant to disclose, and that these factors are more probably the fundamental cause of her neurosis." Plaintiff did not testify as to any conversation she had with Dr. Smith concerning the "factors of the accident," or concerning any conversation in which she undertook to describe to him how the accident occurred or the details of the collision.

By the express terms of the statute, physicians and surgeons are incompetent to testify without the consent of their patient with respect to two subjects: (a) Any communication made to him with reference to any physical or supposed physical disease; and (b) any knowledge obtained by personal examination of any such patient. American Bankers Ins. Co. v. Hopkins, 67 Okla. 150, 169 P. 489.

If the rule there announced is strictly applied, there is a matter of doubt whether the letter written by Dr. Smith to Dr. Pemberton was competent, and whether Dr. Smith was a competent witness to testify to the explanation of the sentence above quoted. But the objection does not go to the competency of the witness. It is not contended here, except incidentally, that the letter itself was incompetent as being a confidential communication. In her reply brief plaintiff specifically states that:

"In no part of this argument is the point made that the evidence is not admissible because it was a confidential communication between patient and physician."

The objection is that it is "incompetent, irrelevant and immaterial because it was a mere suspicion based on no facts, experience or knowledge; that it was evidence of mere speculation without any foundation expressed in the latter, and is, therefore, not admissible for any purpose."

Defendant contends that it was admissible as tending to contradict the testimony of Dr. Smith as to the nature and cause of plaintiff's condition. Dr. Smith had on direct examination testified that after an examination made by him he arrived at a diagnosis of traumatic neurosis. He then explained the meaning of that term. He was then asked to state what in his judgment was the cause of the condition he found. He replied "automobile accident which she told me about * * * in which she was riding in a car and the car had been struck by a railway car or interurban, I believe, she was rather severely bruised and banged up, out of which her nervous symptoms developed later." He then testified that he could not arrive at any other conclusion as to the cause for her symptoms and condition than the accident. He was then confronted with the letter he wrote Dr. Pemberton in which he had used the language concerning his suspicion as to "factors in the accident that the patient would be somewhat reluctant to disclose, and that these factors are more probably the fundamental cause of her neurosis." He was asked what he meant by this expression, and particularly what factor he referred to. Certainly it was competent to show by Dr. Smith that he had at another time made a statement varying from that made in his direct examination, bearing in mind that he had testified that he could not arrive at any cause for her symptoms and condition other than the accident in which she was "severely bruised and banged up, and out of which her nervous symptoms developed later." True, he said it was merely a suspicion, but nevertheless it was in effect an expression of a doubt that the accident and the resulting injuries alone produced or caused the neurotic condition.

It is next contended that the court erred in admitting evidence on the part of defendant of an experiment made sometime after the accident relative to the maximum speed obtainable by the street car in question in approaching the intersection.

Plaintiff introduced evidence tending to show that the street car in approaching the intersection was traveling at a rate of speed of some 30 to 35 miles per hour. To refute this evidence defendant offered evidence of a test made with the identical car, under what was testified to as similar conditions, which test the witnesses swore showed that the maximum speed which a car could be made to attain at the identical place was from 19 to 21 miles per hour.

The general rule is that evidence as to the result of experiments is admissible where it is shown that the experiment was made under exact or similar conditions.

"In order that an experiment shall possess sufficient probative value to warrant the admission of evidence thereof, it is necessary that the circumstances under which the experiment is made shall have been similar to the circumstances prevailing at the time of the occurrence involved in the controversy, and if the conditions were dissimilar in an essential particular, the evidence is rejected, especially if the conditions were more favorable to the party offering the evidence. It is not necessary, however, that the conditions should be exactly identical, but a reasonable or substantial similarity is sufficient." 22 C. J. 758-759.

The question of whether or not a sufficient similarity of conditions is shown is a preliminary question for the court. The burden is upon the party offering the evidence to show sufficient similarity of condition. The record shows a substantial compliance with the rule in the instant case.

The next proposition is that the court erred in giving certain instructions to the jury and refusing plaintiff's requested instructions Nos. 2, 4, and 7. As to this contention we deem it necessary to consider only general instructions 9 and 12, given by the court. In instruction No. 6, the court properly instructed the jury that the negligence, if any on the part of Dr. Bentley, the driver of the automobile, was not imputable or chargeable to the plaintiff, and if the jury should believe from the evidence that Dr. Bentley was guilty of negligence, and also the defendant was guilty of negligence, and that the negligence of defendant alone, or concurring with that of Dr. Bentley, was the proximate cause of the accident, the verdict should be for plaintiff, unless the plaintiff herself was guilty of contributory negligence.

Instruction No. 4 defined "contributory negligence" and "proximate cause."

Instruction No. 12, as given, shows:

"The contributory negligence charged by the defendant against the plaintiff, Anna Enghlin, is that she did not use due care in keeping a lookout for the street car and in failing to warn the driver of the automobile of the danger of any acts of negligence chargeable against said driver. In this connection you are instructed that while acts of negligence on the part of the driver of her automobile is not chargeable against her, yet that the said Anna Enghlin could not sit idly by the driver and permit him to do acts of negligence that would place her in a place of danger without warning him of such danger and protesting against such negligent acts if known to her, or could have been known to her by the ex-

ercise of ordinary care on her part. In determining whether or not she was thus guilty of contributory negligence and whether or not such contributory negligence, if proven, proximately contributed to the accident, the jury should consider the fact that she herself was not driving the car and had no direct control over the same, and whether or not any warning on her part if given in all probability could or would have been acted upon by the driver in time to prevent the accident, taking into consideration all of the circumstances and conditions involved in this case."

While this instruction was excepted to by plaintiff, it is not pointed out wherein it is erroneous.

Instruction No. 9, in part, is as follows:

"You are further instructed that if you believe from the evidence in this case that the crossing where the accident occurred was a dangerous crossing by reason of the view being obstructed by the contour and lay of the ground, or of shrubbery, or any other obstructions which would obstruct the view of the approach of street cars, of persons crossing over said street car crossing, or the agents, servants and employees of said street car company operating said street car from seeing persons crossing over said street car line at said crossing, then, it would be the duty of the persons in charge of said street car and of the plaintiff in passing over said crossing to take reasonable care to prevent injuries to each other and to the property of each other. * * *"

There appears to be no objection to the instruction thus far, but the instruction continues as follows:

"* * * And if coming at a high rate of speed and the danger could not be observed, it was the duty of the agents, servants and employees of said street car company and of the plaintiff crossing said street car line to moderate the speed of the street car and of the automobile and to endeavor to get the same under control so as to prevent an accident at such crossing."

Plaintiff contends that that part of the latter clause which says, "and of plaintiff crossing said street car line to moderate the speed of the street car and of the automobile and to get the same under control," etc., casts a greater burden upon plaintiff than the law warrants and is in direct conflict with instruction No. 12, and casts the burden upon plaintiff to exercise the same degree of care as the driver of the automobile.

Plaintiff not being the driver of the automobile, and the negligence of the driver thereof, if any, not being imputable to her,

it is difficult to understand how it could be said to be her duty to moderate the speed of the automobile. It must be borne in mind that the petition alleges, and there is evidence tending to show, that the crossing in question was more dangerous than the ordinary crossing, and the instruction complained of appears to cast the burden upon plaintiff to moderate the speed of the automobile in which she was riding.

In Thrasher v. St. L. & S. F., 86 Okla. 88, 206 P. 212, it is said:

"While it is true that it is the duty of a passenger riding in an automobile as the guest of the driver not to submit her safety entirely to the prudence and care of the driver, yet she is only required to exercise such degree of care and prudence as may be expected of a reasonably prudent person situated under similar circumstances, and such a passenger situated as the deceased was in the case at bar cannot be held guilty of contributory negligence as a matter of law merely because she remained silent and did nothing."

The court therein quotes with approval from Hardi v. Central Cal. T. Co., 36 Cal. App. 488, 172 P. 763, the following:

"Such interference by the passenger or guest where the vehicle is about to be placed in a position of danger might prove to be gross imprudence and so disconcert the driver as to cause the disastrous result which such interference was designed to avoid."

While it is true that the court in other instructions told the jury that the duty of plaintiff was only to exercise that degree of care which a reasonably prudent person would have exercised under the circumstances, said instruction No. 9, above quoted, in effect, told the jury that in case of a dangerous crossing, in approaching same at a high rate of speed, then such ordinary care required plaintiff to moderate the speed of the automobile over which she had no control. The instruction cast an undue burden upon plaintiff and is in conflict with the other instructions.

The rule on conflicting instructions is well stated in Schulte v. Garrett, 99 Okla. 52, 225 P. 904, wherein it is stated:

"The instructions as a whole must be consistent and harmonious, and where two instructions contain inconsistent propositions, the case will be reversed for the reason that the court is unable to tell which the jury follows and which they ignore."

It is impossible for this court to say whether the jury followed the general instruction where it was said plaintiff was required to use ordinary care, that is, to

act as an ordinarily prudent person would act under the circumstances, or the instructions which told the jury in effect that it was the duty of plaintiff in approaching dangerous crossings at a rapid rate of speed to moderate the speed of the automobile. There would perhaps be no objection to such an instruction had the plaintiff herself been driving the automobile, but to say it was her duty to moderate the speed of the automobile where she had no control over it, or where she was, as in the instant case, the guest of the driver, whose negligence, if any, was not imputable to her, was such error as requires reversal in this case.

For the error pointed out, the judgment is reversed and the cause remanded for a new trial.

SWINDALL, OSBORN, BAYLESS, and WELCH, JJ., concur.