[Civ. No. 4012. Third Appellate District.--February 19, 1930.]

VIOLET SCOTT SWITZLER, Respondent, v. ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al., Appellants.

Robert Brennan, M. W. Reed, E. T. Lucey, Leo E. Sievert and H. K. Lockwood, for Appellants.

Charles H. Vance and Levinsky & Jones for Respondent.

PLUMMER, J.—(For convenience, the plaintiff in this action will be referred to as the "plaintiff," and the three appellants, simply as "appellants.")

The plaintiff had judgment against the appellants in an action prosecuted by her against the appellants and the defendant Leo F. Sweem, to recover damages suffered by reason of a collision between an automobile driven by the defendant Leo F. Sweem, and an engine drawing a train of cars belonging to the Atchison, Topeka and Santa Fe Railway Company, and operated by J. J. Scott, as engineer, and C. A. Parks, as fireman.

The complaint alleges that the automobile was driven carelessly and negligently by the defendant Leo F. Sweem, and that the train belonging to the Railroad Company was operated carelessly and negligently, at an excessive rate of speed, and without warning, through and over the public streets of the city of Stockton; and further, that no sufficient and adequate warning signals were placed, maintained or in operation at the crossing where the collision involved in this action, occurred.

The record shows that a collision occurred between an automobile driven by the defendant Leo F. Sweem, in which the plaintiff was riding as a guest, and an engine operated by the appellant at a point where the Santa Fe Railway Company, passing through the city of Stockton intersects a

certain highway therein known as El Dorado Street. The collision occurred at about 11:30 P. M. of April 30, 1927. The automobile in which the plaintiff was riding was of the type commonly known as a "Paige" coupe, with a rumble seat. However, the plaintiff and three others were all riding in the front seat, the plaintiff occupying a position in the front seat partly upon the seat and partly upon the lap of one of the other passengers therein. The party in the coupe were traveling southward on El Dorado Street; the train operated by the appellants was traveling eastward. El Dorado Street and the tracks of the Atchison, Topeka and Santa Fe Railway, intersect at practically right angles. The main track of the Railway Company is maintained along what is known as "Taylor" Street; the first street to the north of Taylor Street is "Scotts Avenue"; the first street to the west of El Dorado Street is "Center Street"; and the street immediately east of El Dorado Street is known as "Hunter Street." Between Scotts Avenue and Taylor Street are some ten or twelve different railroad tracks. Immediately to the north of the main line of the Atchison, Topeka and Santa Fe Railway is a switching track known as and called the "House Track." This track runs along by the side of a freight-shed belonging to and used by the Company, situate between El Dorado and Center Streets. The area west of El Dorado Street and east of Center Street, lying between Taylor Street and Scotts Avenue, contains a number of buildings. The freight-shed just referred to is a one-story structure having a loading platform which extends approximately 150 feet east from the east wall of the freight-shed. The record also shows that there is a structure on this platform used for housing freight, being protected by a roof and on the sides by upright slats. This structure is situate at the northeast corner of the platform to which we have just referred. This slatted structure, as appears by the photographic exhibits, is of the form and outlines of ordinary box-cars. Upon the night of the 30th of April, 1927, the plaintiff, in company with the others, was traveling southward on El Dorado Street, as hereinbefore stated, and as the automobile reached a point where the main line of the Atchison, Topeka and Santa Fe Railway Company intersects El Dorado Street, the automobile came in collision with the pilot of the en-

gine. There is much contention as to whether the automobile struck the engine or whether the engine collided with the automobile. It would appear from the record that an instant before the collision the automobile was swerved slightly to the left, as the impact of the pilot of the engine appears to have been upon the portion of the automobile just in the rear of the front right wheel, the record showing, however, that the left-hand side of the pilot was more or less shattered by the impact. Although there is testimony in the record that just prior to the collision the automobile had been slowed down to a speed of five miles an hour, the record shows that its speed was sufficient so that the occupants, as well as the wrecked automobile, were carried completely across the railroad track and landed on the pavement of El Dorado Street to the south. This physical fact would indicate that the speed of the automobile was much in excess of five miles per hour, as the sudden stop of an automobile not traveling over five miles an hour would not catapult anyone the distance shown to have taken place in this case. The testimony of one Rieger, who was driving an automobile, is to the effect that when about 150 feet from the point of collision, and driving at about ten miles per hour, the machine in which the plaintiff was riding passed him at at least double his speed. The fact that all of the party and the wreck were propelled entirely across the railroad track and some distance to the south thereof, instead of being thrown eastward by the force of the collision with the engine, would indicate that the speed of the automobile had not been materially slackened. However, the jury in this case found in favor of the defendant, Leo F. Sweem, and we are not concerned with his contributory negligence, save and except as to whether it was of such a character that contributory negligence would likewise be imputed to the plaintiff herein. ■ There is no testimony that the automobile was .stopped in order that the parties therein might look and listen for an approaching train, although it is clear from the records that the view to the westward was more or less obstructed. Under the conditions presented it would seem clear that the driver of the automobile in question was negligent under the rule laid down in the case of *Koster et al.* v. *Southern Pac. Co.*, 207 Cal. 753 [279 Pac. 788], and likewise, in the case of *Bar-*

*nett* v. *Atchison, T. & S. F. Ry. Co.*, 99 Cal. App. 310 [278 Pac. 443], and the cases there cited. The testimony of all of the occupants of the car was to the effect that they heard no warning bell and that they heard no whistle; nor did they perceive the noise of the approaching train, which consisted of an engine, thirty-six cars and a caboose. The testimony of the occupants of the automobile was also to the effect that they were listening to determine whether there was any indication of an approaching train, and heard no warning. The record shows that an electric arc light is maintained at the intersection of El Dorado and Taylor Streets in such a position that it casts a bright light over the immediate point of contact involved in this action, and would to some extent mingle with the headlight of an approaching train and the headlights of an approaching automobile in such a manner as not to give warning of the approaching train. The record contains testimony on behalf of the appellants to the effect that the bell on the engine, operated by an automatic contrivance, had been set in operation some distance to the westward of El Dorado Street, and that the station whistle had been sounded. A few seconds before the collision actually occurred, the fireman on the engine saw the approaching automobile, gave three short whistle blasts, and called to the engineer to stop, who immediately did everything that could be done to bring the train to a standstill. From the hour of 6 A. M. to 10 P. M., the company at the time maintained a flagman. After 10 P. M. and until 6 A. M. an electric signal was in continuous operation, giving warning that no flagman was maintained. The foregoing constitute the salient features of the testimony set out in the transcript.

Departing somewhat from the order of attack made by the appellants in this case, we will first consider the question of contributory negligence, waiving the question as to whether such negligence was or is properly pleaded. ■ This question has been before the appeal courts of this state a number of times, and it seems to be pretty well settled that a guest riding in an automobile must use ordinary care and prudence to insure his own personal safety, that is, he must use such reasonable care and prudence as an ordinarily prudent person would exercise under like circumstances. However, a guest, when not having any control, supervision or

management over the automobile, is not placed in the same legal situation as the driver. As stated in *Carpenter* v. *Atchison, Topeka Ry. Co.,* 51 Cal. App. 60 [195 Pac. 1073]: "Interference by the passenger or guest, where the vehicle is about to be placed in a position of danger, might prove to be gross imprudence, and so disconcert the driver as to cause the disastrous results which such interference was designed to avoid." And further, the opinion in that case states, referring to the driver: "For aught that appears to the contrary, he might have reasonably believed that Gibson intended to and would have either stopped or increased the speed of the car and thus have easily escaped the threatened peril." The opinion in that case quotes from a number of other cases, and then the rule approved is as follows: "Assuming that deceased, when the automobile which he occupied as a passenger or guest, reached the point thirty feet distant from the crossing, and traveling at a speed of only four miles per hour, saw the train three hundred feet away therefrom and approaching at a high rate of speed, we cannot say, as a matter of law, that his failure to interfere with the driver's operation of the car rather than to rely upon the latter's judgment in escaping the threatened danger, nor that his failure to leave the car, constituted contributory negligence. The question as presented was one of fact which should have been left, to the verdict of the jury." In *Curran* v. *Earle C. Anthony, Inc.,* 77 Cal. App. 462 [247 Pac. 236, 239], we find the following: "While one who knows, or should know that the driver is carelessly operating the car must use ordinary care for his own safety, and it is incumbent upon him to take proper steps for his own protection, still whether failure to protest against the course being pursued by the driver, or to leave the vehicle, constituted a want of ordinary care which proximately contributed to his injuries was a question of fact to be submitted to the jury unless from the evidence but one conclusion might reasonably be drawn." The following cases all show that whether the guest is chargeable with contributory negligence in not protesting with the driver, or doing anything to interfere with his management and control of the car, is a question to be submitted to the jury under proper instructions: *Crabbe* v. *Mammoth Channel Gold Min. Co.,* 168 Cal. 500 [143 Pac. 714]; *Ilardi* v. *Central Cal. Traction*

*Co.,* 36 Cal. App. 488 [172 Pac. 763]; *Dover* v. *Archam-beault,* 57 Cal. App. 659 [208 Pac. 178]; *Carpenter* v. *Atchison, Topeka Ry. Co., supra; Curran* v. *Earle C. Anthony, Inc., supra; Drouillard* v. *Southern Pac. Co.,* 36 Cal. App. 447 [172 Pac. 405]. These authorities are sufficient to show that in the instant case the negligence of the plaintiff was properly left to the determination of the jury. We may properly call attention, however, to the case of *Campion* v. *Eakle,* 79 Colo. 320 [246 Pac. 280], 47 A. L. R. 289, and the extended notes appended thereto beginning on page 293. It may be further stated that the facts and circumstances attending the driving of the automobile involved in the collision under consideration are entirely different from instances where the facts show the guest or passenger to have been aware of the careless and negligent habits of an automobile driver, or of his intoxicated condition, where the courts would be called upon to declare a plaintiff riding as a guest, guilty of contributory negligence as a matter of law. ■ Here, there is nothing indicating that the plaintiff had any knowledge of any reckless, careless or inattentive manner of driving an automobile by the defendant Leo Sweem, until it was too late to interpose any objections or protest against his manner of driving, as a guest has a right, in using the ordinary and usual care which a prudent person is required to exercise, to assume that an automobile driver will drive in a proper manner and will take the necessary precautions to safeguard the lives of his guests or passengers, and in the absence of knowledge to the contrary, under the authorities the question of contributory negligence must go to the jury. ■ That the negligence of an automobile driver, even in approaching railway crossings, is not imputable, as a matter of law, to a guest or passenger having no control or direction over the operation of the machine, clearly appears by the text found in 3 California Jurisprudence, pages 853, 854 and 855, and the authorities in the footnotes supporting the text.

■ Upon the question of whether any warning was given by the appellants of the approach of the train, testimony *pro* and *con* has been urged upon our attention—on the part of the appellants, that the testimony is positive that the bell was rung when the whistle sounded; on the

part of the respondent, that no such signals were heard. This again presents only a subject proper for the consideration of the jury. In 22 California Jurisprudence, page 311, the rule is thus stated: "Positive testimony is doubtless of greater weight than negative testimony. Hence, the testimony of witnesses to the effect that they heard signals is of greater probative force than the statement of other witnesses that they did not hear any signals. But where the trier of facts has given credence to the negative testimony, the reviewing court is bound by the finding that the signals were not sounded." The footnotes cite a number of cases. See, also, *Jones v. Southern Pac. Co.*, 74 Cal. App. 10 [239 Pac. 429], where additional cases on this subject are cited.

█ This brings us to the principal grounds urged for reversal upon this appeal, to wit, the rule of the court in the selection of the jury, the admission of an ordinance of the city of Stockton regulating the speed of trains, and alleged errors in the instructions given by the court to the jury. Upon the selection of the jury the defendants in the action were restricted to the exercise of four peremptory challenges. Upon this appeal it is contended by the appellants that they were entitled to four peremptory challenges and that the defendant Sweem was likewise entitled to four peremptory challenges. This, upon the theory that the appellants and Leo F. Sweem constituted antagonistic parties, the appellants claiming that the defendant Leo F. Sweem was wholly chargeable for the collision and the resultant injuries to the plaintiff. Section 601 of the Code of Civil Procedure reads: "Either party may challenge the jurors, but where there are several parties on either side, they must join in the challenge before it can be made. The challenges are to individual jurors, and are either peremptory or for cause. Each party is entitled to four peremptory challenges," etc. Under the construction contended for by the appellants the plaintiff would have four challenges, the appellants four and the defendant Leo F. Sweem, four. Following the rule adopted in some of the eastern states, where the subject is unregulated by statute, the appellants' contention would appear to be correct. The exercise of a peremptory challenge in civil cases is purely a right or privilege granted by statute. As said in 35 C. J., page 406, section 460: "At common law there is no right of peremp-

tory challenge in civil actions. The right is, therefore, purely statutory, and does not exist except where expressly so conferred, but such provision has now been very generally made." And further, in the same volume, section 468, it is said: "In civil actions where there are several plaintiffs or several defendants, the general rule is that all on one side constitute but one party, and are entitled only to the number of peremptory challenges allowed a single plaintiff or defendant, and statutes giving to each party a certain number of peremptory challenges are uniformly so construed." (Citing a number of cases in the footnotes.) In some of the states where the statutes do not so provide, it appears that a different rule prevails. Thus, as said in 35 C. J., page 410: "The rule, however, is to be applied according to the reasons upon which it is based and limited to cases in which the positions of the several parties upon the same side are similar, so while the fact that several defendants who set up a common defense plead separately does not entitle them to any additional peremptory challenges, the rule is otherwise where they set up separate and distinct defenses presenting different issues, or where the parties on one side, although having a common cause against the other, have conflicting rights among themselves which the verdict of the jury will affect." However, on the same page, and as a part of the same section of Corpus Juris, we find the following: "The statutes sometimes expressly provide that if there are several parties on either side of a controversy they must all join in their challenges, and in such case the rule allowing parties appearing separately to interpose separate challenges cannot obtain." (Citing a number of authorities.) The earliest case touching on this subject which we have discovered is that of *People* v. *McCalla et al.*, 8 Cal. 301, which, however, is a criminal case. There it was held that under the statute then prevailing, even in capital cases where there were several defendants tried together, they were required to join in their peremptory challenges as well as their challenges for cause. The later amendments regulating challenges do not affect the rule stated. In 15 California Jurisprudence, page 407, section 79, the rule in relation to joinder of challenges is thus stated: "In civil actions, where there are several parties on either side, they must join in

the challenge before it can be made. In construing these provisions it has been held in criminal cases defendants must join in peremptory challenges as well as in those for cause. The provision of the Code of Civil Procedure does not deny persons the equal protection of the laws and thus violate the fourteenth amendment, for the same rule applies to all the parties to an action where they are united with others, either as plaintiffs or defendants.'' In *County of San Luis Obispo* v. *Simas*, 1 Cal. App. 175 [81 Pac. 972], section 601 of the Code of Civil Procedure was construed to require all of the defendants to join in the challenges irrespective of interest. In *Muller* v. *Hale*, 133 Cal. 163 [71 Pac. 81], it is said: ''Either party may challenge the jurors, but where there are several parties on either side, they must join in a challenge before it can be made. A similar provision was contained in the old Practice Act. The appellant states that the ruling of the court was justified by the statute in this state, but contends that it violates the 14th amendment of the Constitution of the United States in that it denies persons equal protection of the laws. We see nothing in this contention, inasmuch as the same rule applies to all the parties to an action where they are united with others either as plaintiffs or defendants.'' As we read the case of *Muller* v. *Hale*, we find that the defendants had antagonistic interests, each trying to shift the *onus* of the alleged negligence leading to the plaintiff's injury upon the shoulders of the other defendant, precisely similar to the circumstances presented in the instant case. In *Crandall* v. *Puget Sound Traction etc. Co.*, 77 Wash. 37 [137 Pac. 319], a similar question was presented to the Supreme Court of Washington. Among other things, it was there said: ''The right of peremptory challenge of jurors is wholly statutory and the legislature may withhold the right entirely or it may grant it with restrictions.'' The statute there under consideration is practically identical with section 601 of the Code of Civil Procedure, and while the reasoning set forth in the opinion in that case, and taken particularly from the case of *Colfax Nat. Bank* v. *Davis*, 50 Wash. 92 [16 Ann. Cas. 264, 96 Pac. 823], answers every objection urged by the appellants, it is too long to be set forth herein, but we think is absolutely conclusive against any other construction than that under section 601 of the

Code of Civil Procedure, all the defendants must join just as the wording of the statute directs. A different rule apparently prevails in the state of Montana, as appears from a consideration of the case of *Mullery* v. *Great Northern Ry. Co.*, 50 Mont. 408 [148 Pac. 323], but the statute there interpreted reads differently. In the case of *Chenoweth* v. *Great Northern Ry. Co.*, 50 Mont. 481 [148 Pac. 330], the Supreme Court of Montana again holds that where two defendants, sued jointly, are in fact hostile, so as to entitle them to separate peremptory challenges, but one of them sits by and allows the other to exercise the challenges alternately with the plaintiff without calling the court's attention to his rights to a separate challenge, such party is held to have waived his challenges. In the case at bar, it does appear that the court stated, while there was actually nothing before the trial court to be decided, its views as to how it would hold on the question of challenges, using these words: "In other words, I will let you know how the court will rule. You will know better how to protect yourself. It is my holding that you in the aggregate have but four peremptory challenges"; an examination of the record shows that the respective defendants, without any objection to any of the challenges made by either of the defendants, joined in all of the four peremptory challenges exercised by the defendants, and after the four peremptory challenges in which all of the defendants joined had been exercised, no challenge was interposed by either of the defendants that would give the court an opportunity to rule. On an examination of the cases relied upon by the appellants, touching the construction which should be given section 601 of the Code of Civil Procedure, we find that they are based upon entirely different statutory or code provisions. The principal case, that of *Rutland* v. *St. Louis etc. Ry. Co.*, (Tex. Civ. App.) 274 S. W. 284, among other things says: "The rule is to treat several defendants as one party, within the meaning of the statute, declaring that each party to a civil suit in the district court shall be entitled to six peremptory challenges, unless such defendants have conflicting rights which the verdict of the jury will affect." (Citing a number of cases.) There does not appear to be anything in the opinion in that case, or in any of the cases cited by the appellants, corresponding to the provisions of our Code of

Civil Procedure, requiring the parties to join in their challenges. We think the rule is well established in California and in other states having similar statutes or code provisions, that section 601 of the Code of Civil Procedure must be so construed as to require all of the defendants to join in the four peremptory challenges. ██ Objection is also urged that the court permitted the plaintiff to exercise a peremptory challenge after once having passed the jury. Nothing is set forth showing that the appellants were injured by this ruling of the court. The plaintiff, in fact, was only allowed to exercise four peremptory challenges. In 15 California Jurisprudence, page 410, section 82, the rule applicable to this ruling of the court is thus stated: "One is not entitled to have any particular juror sit upon his case so that, as has been pointed out in another article, any error in allowing a challenge, either peremptory or for cause . . . is without prejudice, where it appears that a fair and impartial jury was obtained." (See, also, *Jones* v. *Southern Pac. Co., supra.*)

After testimony had been adduced relative to the rate of speed at which appellants' train was being propelled, both to the effect that it was in excess of eight miles per hour, and also to the effect that it was not, an ordinance of the city of Stockton was introduced in evidence, which ordinance limits the speed of trains within the corporate limits of the city to eight miles per hour. Upon the proposal of plaintiff's counsel to read the ordinance to the jury, counsel for appellants interposed the following objection: "And to the reading of the ordinance at this time, on behalf of the defendants whom I represent, I object to the reading of the ordinance on the ground that it is unconstitutional; that the defendant Atchison, Topeka and Santa Fe Railway Company is a common carrier of interstate commerce, and that as such no municipality, or either state or municipal ordinances, have power to place any burden or restriction upon interstate commerce, and that such power rests solely with the Congress of the United States, under the Constitution of the United States, and that any ordinance, or this ordinance in particular, is unconstitutional so far as interstate commerce and this defendant is concerned."
It may be here stated that the testimony indicated that the train involved was partly loaded with merchandise destined

for places outside of California, and was carrying interstate commerce to that extent.

Upon this appeal, the objection taken in the trial court appears to be abandoned, and it is now urged that the regulation of the speed of trains through municipalities lies solely within the jurisdiction and power of the Railroad Commission, and that any attempted exercise thereof by an incorporated municipality is void. In the case of *Cleveland, Cincinnati, Chicago and St. L. Ry. Co.* v. *Grambo*, reported in 103 Ohio St. 471 [20 A. L. R. 1214, 134 N. E. 648], the Supreme Court of Ohio thus disposes of the constitutional question: (We are quoting from the syllabus): "An ordinance regulating the speed of trains through a municipality enacted under the exercise of police power which conforms to the limitations prescribed by the legislature, is presumptively reasonable and valid, and not in conflict with the State or Federal Constitutions. Before the presumption may be rebutted, and in order to overcome such presumption, a Railway Company must affirmatively show its unreasonableness." No testimony was offered in the instant case tending to show the unreasonableness of the ordinance limiting the speed of trains. The Ohio case to which we have just referred further holds: "That an ordinance regulating speed, passed in the proper exercise of police power in the interest of the safety, and for the protection of the public, is competent evidence in a personal injury case under the settled law of Ohio." The same rule prevails in California. As to the reasonableness of ordinances regulating the speed of trains in various municipalities, reference may be had to the annotation following the Ohio case, beginning on page 1222 of 40 A. L. R. A consideration of the cases there quoted leads to the conclusion that no objection could be urged to the reasonableness of the speed specified in the Stockton ordinance.

In 22 R. C. L., page 800, it is said: "It is very generally held that ordinances regulating the speed of trains within city limits are police regulations, and that the power to pass them need not be given in express terms, but may be implied from the general powers of the city, as to abate nuisances and provide for the general welfare." We think no further citation is necessary in support of the power of municipalities to adopt ordinances regulating the speed of

trains, and that such ordinances properly come within the purview of what is generally known as police powers.

In support of appellants' contention that the ordinance of the city of Stockton is inapplicable, and that it was error to read it to the jury and to instruct the jury with reference thereto, the following Illinois cases are called to our attention: In *City of Witt* v. *Cleveland, C. C. & St. Louis Ry. Co.*, 324 Ill. 494 [155 N. E. 325], the Supreme Court of Illinois held that the laws of 1921, page 733, creating the Public Utilities Commission, withdraw from cities and villages powers theretofore exercised by them with reference to speed and operation of railway trains running through cities, and vested such power in what is now called the commerce commission, and therefore, that ordinances attempting to regulate the speed of trains, adopted by municipalities, were void. In the case of *Northern Trust Co.* v. *Chicago Rys. Co.*, 318 Ill. 402 [149 N. E. 422, 425], with reference to an ordinance requiring certain headlights to be upon street-cars, it was held under the Public Utilities Act of 1913, which became effective January 1, 1914, inoperative and void, as the commission was given power to require every public utility to maintain and operate its equipment in such a manner as to promote and safeguard the public safety; to prescribe the installation, use and maintenance of appropriate safety devices or appliances; and to require the performance of any other acts which the public safety might demand. And further, that "the act charged the commission, so far as the operation of a public utility in the streets of a city was concerned, with the duty of protecting and promoting the safety of the public, and vested in the commission plenary power to perform that duty." In the case of *Chester* v. *Chicago, B. & Q. Ry. Co.*, 247 Ill. App. 505, where a speed ordinance was being considered, the court said: "While prior to January 1, 1914, cities in this state had power to pass ordinances regulating the speed of trains while passing through such cities, the general assembly by the passage of 'An act to provide for the regulation of public utilities,' approved June 30, 1913, in force January 1, 1914, created the public utilities commission, and by 'an act concerning public utilities,' approved June 29, 1921, in force July 1, 1921, created the commerce commission and vested it with general supervision of all public utilities, in-

cluding the power, by general or special orders, rules or regulations, or otherwise, to require every public utility to maintain and operate its plant, equipment or other property in such manner as to promote and safeguard the health and safety of its employees, passengers, customers and the public, and to this end to require the performance of any act which the health or safety of its employees, passengers, customers or the public may demand. By this act the general assembly, in its discretion, withdrew from cities and villages the power theretofore exercised by them with reference to the speed and operation of railway trains, and such power is now vested in the commerce commission, another agency of the government.'' In this connection our attention is called to section 42 of the act, relative to powers of the Railroad Commission, wherein it is authorized, ''to require every public utility to maintain and operate its line, plant, system, equipment, apparatus, tracks and premises in such manner as to promote and safeguard the health and safety of its employees, passengers, customers and the public, and to this end to prescribe, among other things, the installation, use, maintenance and operation of appropriate safety or other devices or appliances, including interlocking and other protective devices at grade crossings or junctions and block or other systems of signalling, to establish uniform or other standards of construction and equipment, and to require the performance of any other act which the health or safety of its employees, passengers, customers or the public may demand.'' Further attention is called to the power of the Railroad Commission relative to street crossings, the installation, operation and maintenance of signalling devices, etc., which need not be further specifically mentioned. Under this section and the Illinois cases it is urged that no power exists outside of the Railroad Commission to enact any ordinances relative to the speed of trains within the corporate limits of municipalities. While the Illinois cases apparently support the contention of the appellants, an examination of the Constitution of the state of Illinois reveals the fact that the Public Utilities or Commerce Commission Act, as it is now called in that state, has no constitutional limitation such as we find in our own organic instrument. By section 7½ of article XI of our Constitution chartered municipali-

ties are given very wide and extensive powers, limited only to the extent that their ordinances do not conflict with general laws. Again, section 23 of article XII of the Constitution under which the Railroad Commission of this state exists, contains the following: "From and after the passage by the legislature of laws conferring powers upon the railroad commission respecting public utilities, all powers respecting such public utilities vested in boards of supervisors or municipal councils or other governing bodies of the several counties, cities, and counties, cities and towns in this state, or in any commission created by law and existing at the time of the passage of such laws, shall cease so far as such power shall conflict with the powers so conferred upon the railroad commission; provided, however, that this section shall not affect such powers of control over public utilities as relate to the making and enforcement of local, police, sanitary and other regulations, other than the fixing of rates, vested in any city and county or incorporated city or town, as at an election to be held pursuant to law a majority of the qualified electors of such city and county or incorporated city or town, voting thereon, shall vote to retain, and until such election, such powers shall continue unimpaired," etc. While sections 6 and 8 of Article XI of the Constitution limit the authority of incorporated cities to legislating upon municipal affairs, and in a manner so as not to contravene general laws, and are referred to in many of the cases bearing upon the powers of municipalities, it would appear by the express provisions which we have quoted from section 23 of article XII of the Constitution, that if the subject legislated upon is a local police regulation, then and in that event it is within the reservation contained in the section, or rather within the proviso contained within the section, notwithstanding that the section previously specifies that the powers conferred upon the Railroad Commission respecting public utilities are declared to be plenary and unlimited by any provision of the Constitution. Section 23 of article XII must be read as a whole, and if it appears, as we have stated, that the subject legislated upon is exclusively local, and a police regulation in character, the authority to so legislate is vested in incorporated cities. We may further state that there is nothing in the record showing that the legislature has ever

passed any act regulating the speed of trains through incorporated municipalities, nor does it appear from the record that the Railroad Commission has ever enacted or promulgated any rules or regulations relative to the speed of trains through incorporated cities. From this it follows that the ordinance of the city of Stockton is not shown to be in contravention of any act of the legislature or of any rules or regulations promulgated by the Railroad Commission. That the character of signal devices to be given at railroad crossings, and the manner of constructing grade crossings, overhead crossings and underground passageways are subjects in which the general public are concerned, and therefore of state-wide and not purely local interests, does not detract in the least from the police power reserved to incorporated cities to enact ordinances safeguarding their inhabitants from the perils of excessive speed. The cases of *San Bernardino* v. *Railroad Commission*, 190 Cal. 562 [213 Pac. 980], *Civic Center Assn.* v. *Railroad Commission*, 175 Cal. 441 [166 Pac. 351], *Pacific Tel. & Tel. Co.* v. *Eshleman*, 166 Cal. 640 [Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652, 137 Pac. 1119], and *City of San Jose* v. *Railroad Com.*, 175 Cal. 284 [165 Pac. 967], relied upon by the appellants, have to do only with the physical properties of railroads and matters of state-wide interest, and not with purely local police regulations coming within the proviso set forth in section 23 of article XII of the Constitution.

While practically all of the cases relating to speed ordinances hold that they may be attacked on the grounds of unreasonableness, no such attack is made in this case, and, therefore, we are not called upon to consider this phase of the ordinance. There being testimony in the record to the effect that the speed limit in the ordinance was being exceeded, the ordinance was properly admitted, and the jury correctly instructed in relation thereto.

 It is further insisted that the verdict of the jury exonerating the defendant Sweem, and holding the appellants liable, furnishes sufficient evidence of passion and prejudice on the part of the jury to warrant a reversal. It is likewise strongly argued that the weight of the testimony favors the appellants. In order that a full statement of the case might appear, we have set forth the facts in relation to the operation of the automobile by the defendant

Sweem so that the rule relative to imputed negligence on the part of the plaintiff might be properly considered. While we may agree with the appellants that the jury should also have found against the defendant Sweem, and while we may also agree with the appellants that in view of the positive testimony that the whistle was sounded and the bell was ringing as the train approached the crossing, and while we may also agree with the appellants that the fact that the locomotive was equipped with an automatic bell-ringing device is persuasive in favor of the testimony given by the engineer and fireman, yet as there is testimony in the record to the contrary, the triers of fact having sufficient evidence upon which to base their verdict, we are not at liberty to disturb the judgment entered thereon, because the testimony in the record apparently favors the appellants upon these issues. The case of *People* v. *McCalla,* which we have heretofore cited, is a good example of where the courts may not interfere because of the disparity of the verdict as to the different defendants involved. In that case two men were jointly indicted and tried for the crime of murder. One was convicted of murder in the first degree without recommendation. The other was convicted only of manslaughter. The judgment in that case was upheld without the court attempting to reconcile the two verdicts. Having accepted the testimony of the plaintiff, we may agree with appellants that the verdict should have been against all of the defendants, but as there is sufficient testimony in the record to support the verdict as returned, we are not called upon to reason why, as to the verdict rendered in favor of the defendant Sweem.

 It is finally contended that the court erred in its instructions to the jury. In this behalf the appellants have failed to comply with the provisions of rule 8, relative to the rules governing appeals to this court; nevertheless, we have carefully read all the instructions given by the court, and the refused instructions requested by the appellants. This reading leads to the conclusion that the jury was correctly and painstakingly instructed. The only objection, if objection can be urged thereto, is that they were somewhat too voluminous. When a subject is once covered, it does not appear helpful to repeat an instruction in a little different language. The practice of requesting instructions

couched in a little different language, relating to the same subject, neither aids the court nor assists the jury. The refused instructions in this case, when compared with the instructions given by the court, amount to nothing more than a repetition, in different language, of instructions actually given. The subjects upon which the refused instructions were requested, being sufficiently covered, no reason exists for disturbing the verdict for any alleged errors in relation thereto.

The judgment is affirmed.

Thompson (R. L.), J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 21, 1930, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 14, 1930.

All the Justices present concurred.