[Civ. No. 3995.   Third Appellate District.—April 22, 1930.]

ETHEL G. JOHNSON et al., Respondents, v. SOUTH-
ERN PACIFIC COMPANY (a Corporation) et al.,
Appellants.

Delvin, Delvin & Diepenbrock, George F. Jones and J. D. Peters for Appellants.

J. Oscar Goldstein for Respondents.

PLUMMER, J.—The plaintiffs had judgment in the sum of $30,000 in an action for damages suffered on account of the death of Hallie Lindsley Johnson, occurring at about 12:30 A. M., December 24, 1926, alleged to have resulted from the negligence of the appellants in the operation of a railroad train over a street crossing in the city of Chico. The deceased, Johnson, at the time in question, was riding as a guest, in an automobile driven by one Jack Salyer. The plaintiff, Ethel G. Johnson, is the surviving widow, and

Dorothy Johnson and Gordon Johnson are the minor children of the deceased and of the plaintiff Ethel G. Johnson.

The complaint, after alleging certain preliminary matters not necessary to mention, sets forth that on the twenty-fourth day of December, 1926, Hallie Lindsley Johnson was riding, as a passenger in an automobile, along a public highway known as First Street, in the city of Chico, traveling in a westerly direction, and in so doing reached a point where First Street crosses the right of way of the Southern Pacific Company. It is then alleged that the said deceased was using and exercising due care in his own behalf, and that said defendants, at said time, carelessly and negligently caused one of its regular passenger carrying trains, owned and operated by the defendant company, and then and there in charge of William Edgar Field, as engineer, and Joseph Wilson Laurant, as fireman, to approach said crossing at a high and dangerous rate of speed, and that while approaching said crossing, the defendants negligently and carelessly omitted to give any signal by the ringing of any bell or sounding of any steam whistle, as required by law, and that by reason of such negligence and carelessness, the locomotive drawing said train collided with the automobile in which said Johnson was riding, resulting in his immediate death.

It is further alleged in the complaint that the crossing in question is situated in a thickly populated portion of the city of Chico; that it is so built up that one approaching the railroad crossing from the east is not able to perceive a train coming from the north, until after passing the last building on the north side of First Street. It is further alleged in the complaint that the defendants were aware of the fact that First Street is a much traveled highway. Other matters are alleged in the complaint, but as the gravamen of the action is the alleged failure of the defendants to give proper warning of the approach of the train and running at a high and dangerous rate of speed, it is unnecessary further to follow the allegations of the complaint.

The answer of the defendants admits the running of the train drawn by a steam locomotive. Denies that the deceased was riding as a passenger, in an automobile, along First Street, in the city of Chico; denies that the said deceased was using due care, or any care; denies that the train

was being drawn or propelled at a high or dangerous rate of speed. The answer then admits that the crossing was frequently used; but alleges that said crossing was properly protected, and in addition to the ordinary crossing signs, the defendant company maintained an electric wigwag signal which was operating at the time of the approach of the train in question. The answer then further alleges that the death of Hallie Lindsley Johnson was caused solely by his own negligence. There is no issue tendered by the answer of the defendants, that Hallie Lindsley Johnson's death was caused by the negligence of the driver of the automobile in which Johnson was riding, the negligence of the deceased only being pleaded.

The evidence, as set forth in the transcript, shows that the defendants were operating a south-bound passenger train known as "Number 13," drawn by a steam locomotive, and that the train consisted of 12 cars. Number 13 was due in the city of Chico at about 12:20 A. M., but on the morning of December 24, 1926, apparently was a few minutes late. The deceased was a resident of Chico, by occupation a cement contractor and bridge builder. He, in company with Percy Dow and George Malloy, was riding as a guest in an automobile owned and driven by Jack Salyer. At the crossing heretofore referred to, the automobile was struck by the locomotive of train number 13, and all four of the occupants instantly killed. First Street is a well-paved street running in an easterly and westerly direction across the northern boundary of the business section of the city of Chico, and crosses the right of way of the Southern Pacific Company at right angles. First Street, for many years has been, and on the day in question was, the main artery of travel connecting the east and west sides of the city of Chico. First Street is also the connecting highway between the east and west sides of the Sacramento Valley. The population of the city of Chico at the time of the accident was estimated to be about 14,000. The record likewise shows that First Street and First Street crossing was much used by the traveling public at all times. The main line of the railroad at said crossing runs about due north and south. At the crossing in question there are also five spur-tracks maintained by the defendant company. All four corners of the intersection are well built up. From the

direction in which the deceased was traveling, no view could be had of an approaching train, until one had reached a point about 58 feet from the center of the main-line track. The main-line track is practically straight for a distance of something over 600 feet north of First Street, when it curves gently to the westward. Paralleling the main-line track of the defendant company, for a distance of over 3,000 feet, is a certain highway known as "Nord Avenue." This avenue varies from 350 to something over 400 feet distant from the main line of the railroad. North of First Street the main line of the railroad is intersected by a highway known as "Sacramento Avenue," distant from First Street 3,080 feet. On the four corners of First Street, where it intersects the right of way of the defendant company, were buildings, one used by the Diamond Match Company as a planing-mill, one as a packing plant by the California Packing Corporation, one used as a warehouse by the Pacific Fruit and Produce Company, and one used by Pacific Gas and Electric Company; all of these buildings are shown to be quite large.

On December 24, 1926, no electric light was maintained by the city of Chico at the intersection of First Street with the right of way belonging to the defendant company, the red light on the wigwag signal being the only illumination.

The record shows that during the early part of the evening of December 23, 1926, Jack Salyer, George Malloy and Percy Dow had spent most of their time in and about two poolrooms in the city of Chico, one maintained by a person named Walker, and the other by a person named Quilter. These poolrooms were near a cafe known as "Max's Cafe"; that some time about 11:30 P. M. they were joined by the deceased; that after repairing to Max's Cafe and having some refreshments the four persons just mentioned got into an automobile owned and driven by Jack Salyer and started in a westerly direction on First Street, and proceeded at what some of the witnesses testified to be a high rate of speed, until the crossing was reached. The automobile was a "Moon" touring car, with the curtains down, or at least down so far as the rear portion of the car was concerned. The deceased was riding at the right of the driver.

The testimony on the part of the defendants shows that the train was approaching from the north at a speed of

between 45 and 48 miles per hour, until it reached a point somewhere in the vicinity of Sacramento Avenue, where the brakes were applied and the train from that point on was rolling without the use of steam, and when it reached First Street crossing the speed had been reduced to approximately 30 miles per hour.

On the part of the plaintiff a witness was introduced who testified that he was driving an automobile southerly on Nord Avenue between Sacramento Avenue and First Street, at a rate of approximately 45 miles per hour, and that the engine was running abreast of his automobile; that he slowed down slightly when reaching First Street, in which street he turned easterly and traveled a very short distance when he witnessed the collision and heard the noise made by the engine striking the "Moon" touring car.

There is practically no dispute as to the whistling signals given by the defendant. The testimony is to the effect that the station signal was sounded approximately one mile from the depot, which, by the way, is situate about 1320 feet south of First Street; that shortly thereafter a crossing signal was given before the locomotive reached Sacramento Avenue. Just what distance from the avenue this signal was sounded cannot be determined from the testimony. Thereafter no whistle was sounded until the train was approximately on the intersection. The testimony of the engineer was that he was giving the semaphore call of four blasts while he was passing over First Street. His testimony is as follows: "Q. You gave these four blasts of the whistle about where? A. I was coming over First Street. Q. You gave the four blasts of the whistle as you were coming over First street? A. Yes, sir. Q. Was the whistle blowing as you crossed First Street? A. Yes, sir. Q. Did you see this automobile before you struck it? A. No, sir. Q. What was the first intimation that you had that your engine had struck an automobile? A. The fireman told me." The record shows that the automobile was approaching from the fireman's side of the engine; that as the automobile came past the buildings the fireman called to the engineer to stop the train, but that the engineer was then blowing the semaphore whistle and did not hear him, and that he, the fireman, stepped to the engineer's side, again spoke to the engineer and applied the emergency brakes.

A number of witnesses testified to hearing the station whistle, and also as to the crossing whistle when the train was north of Sacramento Avenue, and that no other whistle sounded until the giving of the semaphore calls which we have just mentioned, while the train was crossing the street where the collision took place.

It thus appears, by the testimony of witnesses for both the plaintiff and the defendant, that compliance was not had with the provisions of section 486 of the Civil Code, relative to the sounding of a whistle at least 80 rods distant from a crossing, and the sounding of the same at intervals thereafter until the crossing is passed. The crossing whistle given was sufficiently distant. The same may be said of the station whistle, which was still farther distant, but after giving the crossing whistle at some point north of Sacramento Avenue, which avenue we have stated is 3,080 feet north of First Street, no other whistling signals were given until the locomotive was practically upon the "Moon" automobile. The fireman testified that the bell was set ringing at about the time the crossing signal was sounded. The engineer testified concerning the ringing of the bell as follows: "Q. Was the bell on that locomotive ringing as you came into Chico that night? A. Yes. Q. How was that bell ringing on that locomotive? A. By a little air motor." The testimony of the fireman as to the ringing of the bell is as follows: "Q. Was the bell on that locomotive ringing as you approached Chico? A. Yes, sir. Q. How do you know that? A. Because I was ringing it myself. Q. You turned it on? A. Yes, sir. Q. Was the bell ringing when the locomotive stopped at the station? A. Yes. Q. How do you know that? A. Because I shut it off." The fireman further testified that he set the bell ringing more than 80 rods distant from the First Street crossing.

On the part of the plaintiff there was introduced the testimony of the witness to which we have heretofore referred as having driven the car on Nord Avenue approximately parallel with the main line of the railroad on which train number 13 was approaching, for a distance of over 3,000 feet; that he heard the crossing whistle given north of Sacramento Avenue, and that from the giving of such crossing whistle no other whistle was sounded until the train was

upon and crossing First Street, and that during the time he was traveling abreast of the locomotive, as herein mentioned, he heard no bell, and that no bell was rung, but that after the collision had occurred he heard the bell ringing on the locomotive. This witness further testified that he was driving with what is called the ''cut-out'' open, but that it made little noise; that the window to his left, and which would be toward the train, was about halfway down. This witness further testified that the train was not making very much noise; that the wigwag was working at the time of the accident appears to be established by uncontradicted testimony.

On the part of the plaintiff, a number of witnesses were introduced who testified that on the night in question all of the four men were sober. On the part of the defendant, testimony was introduced to the effect that the driver of the car, Jack Salyer, was drunk, and that just preceding the time when Johnson got into the automobile, Johnson obtained a flask of liquor from one of the party, gave it to Jack Salyer, who took a drink, and that all of the parties took a drink therefrom. A reading of the testimony would lead to the conclusion that all four of the men had been drinking to some extent. The fact that they had been drinking to some extent does not appear to be contradicted, the testimony in behalf of the plaintiffs going only to the effect that the men were not intoxicated.

Upon this appeal it is contended by the appellants that the plaintiffs failed to prove any negligence of the defendants as the proximate cause of the accident, and that it conclusively appears that the sole, proximate cause was provided by the driver of the automobile; that the plaintiffs failed to prove that the whistle was not sounded and the bell not rung, as required by statute; and that the court erred in refusing to submit to the jury the theory of the defendants that the negligence of the driver of the automobile was the sole, proximate cause of the accident; that the court erred in refusing to give certain instructions offered by the defendants, concerning the intoxication of the driver of the automobile; likewise that the court erred in refusing to instruct the jury upon the effect of intoxication on the part of the deceased.

In so far as the negligence of Jack Salyer, the driver of the automobile, is concerned, it is conceded that his negligence has been established, the testimony showing that he was propelling the automobile toward the railroad crossing at a high rate of speed, and did not stop to look and listen, as the circumstances and conditions surrounding the intersection required.

As we read the record, the cause was tried upon the theory that Jack Salyer was negligent, and also upon the theory that the defendants were likewise negligent in their failure to signal the approach of a rapidly moving train, as required by section 486 of the Civil Code, and that the excessive speed of the train and the lack of signals contributed to the collision; and that the deceased being a guest in the automobile driven by Jack Salyer, and having no control thereof, was not responsible for his acts, and that the negligence of the driver was not attributable to the deceased.

A rather severe attack upon the testimony of the witness Odom, who was the one testifying as to the nonringing of the bell while he was traveling alongside of the defendants' locomotive, is made upon this appeal, but as we have nothing to do with the credibility of the witness, the attack of the appellants on, and the defense of the respondents of this witness, need not be further considered.

Disregarding the effect of the verdict of the jury for a moment, the testimony shows conclusively that no warning signal was given of the approach of the train, by sounding of the locomotive whistle, for considerably over a half mile before the locomotive reached the intersection of First Street. If the warning signal, by sounding the whistle, was given as required by law, at least 80 rods north of Sacramento Avenue, then the last locomotive whistle was sounded approximately three-quarters of a mile north of the intersection of First Street. The finding of the jury, even though upon negative testimony, that the bell was not rung, is conclusive upon this appeal. The verdict of the jury is also conclusive relative to the sounding of the whistles. Thus, if it be conceded, as it must be, that Jack Salyer, as the driver of the automobile, was guilty of gross negligence in failing to stop, look and listen for the approach of the train, yet the jury was warranted, under the testi-

mony, in coming to the conclusion that had the proper signals been given, then and in that case Jack Salyer would have heard the same and taken proper precautions to avert the accident; or at least, that the deceased Hallie Lindsley Johnson would have heard the signals of the approaching train and taken such precautions, in the way of warning Jack Salyer of the approach of the train, as might or would be reasonably necessary to insure his own safety. With these premises in view, there is sufficient testimony in the record to support the judgment that notwithstanding Jack Salyer's negligence, the negligence of the defendants proximately contributed to the death of Hallie Lindsley Johnson, and that the defendants are liable in damages therefor, even though Jack Salyer, if alive, would also be liable in damages. That Jack Salyer should have seen the wigwag signal in motion, and should have responded to its admonition that the company was about to claim the right of way, and that a train was approaching, does not discharge the defendants from complying with the provisions of section 486 of the Civil Code in giving the warning signals as therein required. The jury having rendered a verdict for the plaintiffs upon testimony sufficient to support the same, arguments of appellants that Jack Salyer was alone responsible in carrying Johnson to his death, when he, Salyer, knew that the train was approaching, has no foundation for its support. The allegations of the complaint and testimony in support thereof, upon which the action was tried, are presumed to be included within the verdict of the jury, and, therefore, upon this appeal, we are held to a finding that the proper signals were not given; and if the proper signals were not given, the jury was warranted in concluding that Jack Salyer's negligence in failing to stop, look and listen, was not the sole or proximate cause of the death of Hallie Lindsley Johnson, but rather enforces the conclusion that the death of Johnson was due to the concurrent negligence of both the automobile driver and the defendants. There is no testimony in the record showing that the deceased knew of the approach of the train. That the driver should have known does not charge the deceased. Therefore, the argument based upon such assumption is really assumption only, and need not be answered. The fact that railroad tracks are a sign of danger and constitute a general notice of danger,

and the fact that the installation of a wigwag signal which, in operation, is additional warning or notice of danger, does not relieve the situation in which the appellants have been placed by reason of the testimony to which we have referred, and the verdict of the jury.

A long list of authorities are cited by appellants, all of which tend to establish that the appellants would not be liable in an action for the death of Jack Salyer, but as they do not trench upon the rights of the decedent or of the heirs of the decedent in this case, we do not need to follow them in detail.

We come next to the question of speed. So far as this case is concerned, there is neither statute nor ordinance limiting the speed of trains. However, that does not open the gates wide for the running of trains through a populous city, or a city no larger than that of Chico, estimated to have a population of about 14,000, at such a high rate as to render it dangerous and a negligent act in and of itself. In some states, as set forth in Ann. Cas. 1914B, page 602, the general rule is that in the absence of a prohibitory statute or ordinance, a railroad company may ordinarily run its trains at such speed as it sees fit, and that a charge of negligence cannot be predicated on the rate of speed at which a train is run, unless there are attendant circumstances which makes such speed negligence. (Citing a long list of cases.) Further, on page 603 of the same volume, the modern rule is thus stated: "The recent cases are in accord with the general rule that while no rate of speed is of itself negligence, it may be negligence to run a train at a high rate of speed through a populous community and over a much-frequented crossing." (Citing a long list of cases.)

In *Wyseur* v. *Davis*, 58 Cal. App. 598 [209 Pac. 213], this court had before it consideration of a crossing accident where the speed of a train was involved, and it was there said: "The uncontradicted evidence shows that the train was running at the speed of 45 miles an hour at the time of the accident. The court instructed the jury that it is for the jury to determine, from all the circumstances, whether the rate of speed at which said train was being operated, was negligent. It must be presumed, in support of the verdict, that the jury decided the issue of negligent speed

against the defendant. This implied finding of the jury is conclusive upon appeal.'' Whether the speed of a train in approaching a crossing is so dangerous or excessive as to constitute negligence, is a question for the jury, has been likewise held in the following cases: *Badostain* v. *Pacific Ry. Co.*, 83 Cal. App. 290 [256 Pac. 576]; *Bilton* v. *Southern Pacific Co.*, 148 Cal. 443 [83 Pac. 440]; *Towsley* v. *Pacific Ry. Co.*, 166 Cal. 457 [137 Pac. 31]. The latest case holding that negligence in relation to the speed is a question for the jury is that of *Young* v. *Pacific Electric Ry. Co.*, 208 Cal. 568 [283 Pac. 61], where the cases which we have cited are approved, and a quotation therefrom is set forth to the effect that whether the rate of speed at a crossing is so dangerous or excessive as to constitute negligence must depend upon the circumstances and the conditions involved, etc., which must be determined by the jury.

■ As to the right of the jury to accept negative rather than positive testimony concerning the giving of signals, we need only refer to *Jones* v. *Southern Pacific Co.*, 74 Cal. App. 10 [239 Pac. 429], and the late case of *Switzler* v. *Atchison, Topeka & Santa Fe Ry. Co.*, 104 Cal. App. 138 [285 Pac. 918], where the cases on this subject are quoted and referred to.

■ The next assignments of error necessary to be considered relate to the giving and refusal of instructions. The court, of its own motion, in relation to the speed of the train, instructed the jury as follows: ''The speed of the train, standing alone, does not constitute negligence, and you cannot base a verdict in favor of the plaintiffs, under the evidence in this case, upon proof of excessive speed of the train, unless you also believe from the evidence that the defendants failed to give appropriate warning signals of the approach of the train to said crossing, and that deceased Johnson was not guilty of negligence.'' Excessive speed must be considered in relation to the circumstances, but the error is in favor of the appellants. And further, that: ''In cases where the question of excessive speed is in controversy, it is a question of fact for the jury to decide.'' The court further instructed the jury that: ''Negligence is omitting to do something which a reasonably prudent person would do under the circumstances.'' And that: ''If you believe from all the evidence in the case that

the defendants failed and neglected to give such signal and warning of the approach of the train to the First Street crossing in Chico, as required by law, as a reasonably prudent person would have done under the conditions and circumstances prevailing at the time, and that Hallie Lindsley Johnson was killed by reason thereof, then the plaintiffs are entitled to a verdict at your hands, unless the defendants make out the defense of contributory negligence, as elsewhere explained in the instructions.'' What would constitute contributory negligence on the part of the deceased was then set forth. The jury was also instructed that if the deceased was riding as a guest with Jack Salyer and the jury believed he was so riding, and had no control over the management of the automobile, then the negligence of Salyer could not be attributed to the deceased Johnson. The court instructed the jury in accordance with the wording of section 486 of the Civil Code, and, therefore, we do not think that the objection to the words ''as provided by law,'' inserted by the court in the instruction relative to the giving of signals, constituted error, or, if error, not of sufficient significance to warrant reversal. Nor is the objection of the appellants as to the instruction wherein reference is made to the life expectancy of the deceased of any moment, as the only testimony in the case was just as stated in the instruction.

The court also instructed the jury that they could not find a verdict in favor of the plaintiff unless they believed ''from the evidence that said negligence, if any, was the sole, efficient and proximate cause of the collision of the train with the automobile, resulting in the death of Hallie L. Johnson, and that said Hallie L. Johnson was not guilty of any contributory negligence on his part.'' This, of course, was a far more favorable instruction for the defendants than one to which they were entitled, the law being that where two joint tort-feasors, by their concurrent acts, result in the death of a third person, an action for damages may be maintained. Thus, if the negligence of the defendants and the negligence of Jack Salyer, concurrent in point of time and act, resulted in the death of Johnson, liability would be fixed on the defendants, even though there was a concurrent negligent act on the part of Salyer,

unless there was some contributory negligence on the part of the deceased.

A review of the instructions given, without further particularizing the different ones, leads to the conclusion that no cause for reversal exists by reason of the giving of any of them. ▆▆ The appellants set forth in this behalf the refusal of the court to give three instructions, which we will copy. Defendants' proposed instruction No. 11 is in these words: "The driver of the automobile involved in this action was guilty of gross negligence, that is, a total lack of care in approaching and going upon the crossing immediately in front of the train involved in this action, and had it not been for this negligence on the part of the driver, no collision would have resulted between the train and the automobile. If you believe from the evidence that such negligence on the part of said driver was proximate cause of the collision, you will render your verdict for the defendants in this action." Besides being an instruction upon the facts, this instruction omits all the elements which we have considered relative to the negligence of the defendants, and the question whether, notwithstanding his gross negligence in failing to stop, look and listen, the driver would not have stopped had the required signals of the approach of the train been given.

Defendants' proposed instruction No. 13 reads: "If you believe from the evidence in this case that the decedent Hallie L. Johnson was in such condition, by reason of the use of intoxicating liquor, that he was unable to exercise the care an ordinarily prudent person would exercise under the circumstances shown in evidence, you must find him guilty of contributory negligence in wholly entrusting his care and safety to the driver of the automobile, and must render your verdict for the defendants."

Defendants' proposed instruction No. 14 is in these words: "You are instructed that a person who rides as a guest in an automobile which is driven by a person who is under the influence of intoxicating liquor, is guilty of negligence, and if you believe from the evidence in this case that the driver of the automobile in question was under the influence of liquor, and that the decedent Hallie L. Johnson, knew that he was under the influence of liquor, then I instruct you that for Hallie L. Johnson to ride in said auto-

mobile was negligence in and of itself, which precludes a recovery in this case by the plaintiffs and your verdict must be for the defendants.''

■ Instruction No. 13 above set forth scarcely calls for comment. It certainly is not the law that an intoxicated person may not ride as a guest in an automobile without placing himself at the mercy of every negligent person who may also be using the same highway. If instruction No. 13 is the law, no intoxicated person could be safely taken home while in that state. The intoxication of a guest alone does not take away from him all the protection accorded by the laws of the state, and he is not liable to be killed or injured with impunity, as this instruction would imply.

■ Defendants' proposed instruction No. 14 is somewhat nearer the law, but is not a correct statement thereof. It does not include the negligent driving of the person who is under the influence of liquor. Section 112 of the California Vehicle Act (Stats. 1923, p. 553) makes it unlawful for anyone to drive a motor vehicle while under the influence of intoxicating liquor, and thus, *per se,* makes it negligence for one in that condition to drive a motor-car, and, likewise, the knowledge of such intoxication of the driver on the part of the guest is a question of contributory negligence on his part, for the jury to determine.

Again, a correct instruction in relation to intoxication must be based upon the injury occurring by reason of the negligent operation of the person who is under the influence of intoxicating liquor. In the recent case of *Jones* v. *Pacific Gas & Electric Co.,* 104 Cal. App. 47 [285 Pac. 709], this court reviewed at some length the cases bearing upon the intoxication of automobile drivers. We therein pointed out, where it was shown that the driver of the car was under the influence of liquor, and that the accident was due to his contributory negligence or the manner in which the car was driven by reason of the use of intoxicating liquor, and also the further fact that the plaintiff in that case knew that the driver of the car was under the influence of intoxicating liquor, the plaintiff was guilty of contributory negligence. We also called attention in that case to the language of the California Vehicle Act, which reads: ''Under the influence of intoxicating liquor,''

not that the driver must actually be intoxicated or in a drunken condition, but that he is driving while under the influence of an intoxicant. We there quoted from the case of *Schwartz* v. *Johnson,* 152 Tenn. 586 [47 A. L. R. 323, 280 S. W. 32], the following language: "When one gets into an automobile which is to be operated by a drunken driver, through the traffic of a populous city, such person takes his life in his own hands. All the authorities are to the effect that such contributory negligence prevents a recovery by one taking such a chance if he is injured as a result of the driver's negligence." (Citing a number of cases.) The injury, however, must be due to the result of the driver's negligence. We think it also true that if the injury is due to the joint result of the driver's negligence and the concurrent negligence of a third person, the guest in the automobile knowing of the driver's condition would likewise be chargeable with contributory negligence in riding with the driver under the influence of intoxicating liquor. That the proposed instruction simply, in part, followed the language of the statute, without defining the degree of the influence of the intoxicant, does not seem to militate against its correctness. This question was presented in the case of *People* v. *McKee,* 80 Cal. App. 200 [251 Pac. 675], and it was there held that an instruction following the language of the statute was unobjectionable. Whether the degree of intoxication need be specified in the instruction would seem to be questioned in the case of *Trotter* v. *Bullock,* 148 Wash. 516 [269 Pac. 825], where the Supreme Court at Washington uses this language (after mentioning the fact that intoxicating liquor has a different effect upon different mentalities): "Nor can substantial dispute arise over the claim that one who partakes of liquor, even in a moderate degree, is not able to drive a car with the same degree of judgment as if he was wholly sober. While the modern automobile is a machine that may be driven by one with a very ordinary amount of mechanical knowledge, its extreme flexibility, which permits almost instant response to the action of the driver, makes it an exceedingly dangerous instrumentality to entrust to one not in the full possession of all of his faculties." (Citing *Crowell* v. *Duncan,* 145 Va. 489 [50 A. L. R. 1425, 134 S. E. 576].) The court then refers to the common

fact that one who is careful and competent as an operator of an automobile, when perfectly sober, may become incompetent and reckless after indulgence in one or two drinks. The question of driving an automobile when under the influence of liquor is quite fully considered in the case of *Crowell* v. *Duncan,* as reported in A. L. R., *supra.*

The case of *Jensen* v. *Chicago Ry. Co.,* 133 Wash. 208 [233 Pac. 635], contains an instruction approved by the Supreme Court of Washington, which refers to the fact that the intoxicating liquor must to some degree weaken the judgment, lessen the discretion, or increase the recklessness of the driver. But if all of these elements, or any of them, may be said to be implied in the use of the term ''under the influence of intoxicating liquor,'' the proposed instruction is never-theless an incorrect statement of the law. There is testimony in the record from which the jury might conclude that Jack Salyer was under the influence of intoxicating liquor, within the prohibitory provisions of section 112 of the California Vehicle Act, and that the deceased had knowledge thereof, and also that the deceased, by his own act, aided in placing the driver of the automobile under such influence, and if the requested instruction had correctly stated the law, we are not prepared to say that such an instruction would not have had some bearing upon the verdict of the jury.

██ It is further contended by appellants that if the instruction is incorrect, it should have been modified and given by the court. This contention, however, appears to be without merit. In *Garlick* v. *Bowers,* 66 Cal. 122 [4 Pac. 1138], the court disposed of such a contention as follows: ''The plaintiff requested the court to give several instructions, which were not given. We think none of them should have been given without modification, and that of itself constituted sufficient ground for the refusal.'' The question of whether the driver of the ''Moon'' automobile was under the influence of intoxicating liquor was not presented by the pleadings. It was a special issue brought out by the testimony.

In *Sherman* v. *Kilpatrick,* 83 Cal. App. 307 [256 Pac. 570], it was held that: ''The trial court need not, of its own motion, give special instructions in the absence of a request therefor by counsel.''

In *Dover* v. *Archambeault*, 57 Cal. App. 659 [208 Pac. 178], the question of what duty devolved upon the court in considering erroneous proposed instructions, we find the following language: "Moreover, the proposed instructions omitted the element of negligence in operation of the car. Where instructions offered are such that they cannot properly be given without modification, that of itself constitutes a sufficient ground for refusing them." (Citing the case of *Garlick* v. *Bowers, supra.*)

Upon the same point as to the duty of the court, reference may be had to 3 C. J., page 850 et seq. (See, also, as to "Necessity for Requests," 24 Cal. Jur., p. 796, sec. 74.) Under these authorities it must be held that the failure of the court to instruct on the subject of the use of intoxicating liquor was due to the failure of the appellants to propose a proper instruction, and, therefore, cannot now be assigned as error.

Other reasons have been assigned as error which we have not discussed, but we will content ourselves with the simple statement that they have been fully considered, and we find nothing in any of the assignments of error justifying a reversal. No contention is made that the damages allowed are excessive.

The judgment is affirmed.

Thompson (R. L.), J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 22, 1930, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 19, 1930.